Filed 4/8/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B248671 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA085739) |
| v. | |
| LISA SEDILLO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Arthur H. Jean, Jr., Judge. Affirmed in part and reversed in part.

David Andreasen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson, Supervising Deputy Attorney General, and Blythe J. Leszkay, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant Lisa Sedillo appeals her March 2013 conviction of one count of second degree murder (Pen. Code, § 187, subd. (a)),[1] five counts of attempted murder (§§ 664, 187, subd. (a)), and one count of shooting at an inhabited dwelling (§ 246). The convictions arise out of a gang-related shooting on December 1, 1992 that occurred outside a home in Long Beach. Francisco Moreno, the actual shooter, was convicted in 1995 of murder and attempted murder. Defendant was the driver of the getaway car, and although witnesses identified defendant from a photo array, no witness was able to identify defendant at a live lineup, and as a result, defendant was not charged in connection with the crime. In 2010, a wiretap of defendant's phone in an unrelated matter recorded statements in which defendant admitted her involvement in the December 1, 1992 murder, and in May 2010, defendant was charged in connection with the shooting.

On appeal, defendant contends that (1) the attempted murder and shooting at an inhabited dwelling counts are time barred; (2) the wiretap evidence was improperly obtained and should have been excluded; (3) the trial court abused its discretion in several key evidentiary rulings; (4) her convictions for attempted murder are not supported by substantial evidence and the trial court incorrectly instructed the jury on attempted murder; (5) the trial court harbored bias against expert eyewitness testimony; and (6) the trial court committed sentencing error. We affirm defendant's conviction on the murder count, reverse her convictions on the attempted murder counts, and remand for a determination of whether the statute of limitations on the shooting at an uninhabited dwelling count has expired.

## BACKGROUND

In June 1995, Moreno was convicted of the December 1, 1992 murder of Jason Bandel, and the attempted murders of David Huizar, Juan Carpio, Nicole Valle, Mandi Montez, and Maria Lerma.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

An information filed October 11, 2011[2] charged defendant with the December 1, 1992 murder of Jason Bandel (§ 187, subd. (a); count 1), the attempted murders of David Huizar, Juan Carpio, Nicole Valle, Mandi Montex, and Maria Lerma (§§ 664, 187, subd. (a); counts 2–6), and shooting at an inhabited dwelling (§ 246; count 7). The information further alleged that attempted murders were willful, deliberate and premeditated.

## A. Prosecution Case

### 1. Eyewitness Testimony of the Shooting

On December 1, 1992, at approximately 3:45 p.m. to 4:00 p.m., a wake was held for Rafael Presidio, known as "Keeper," who was a member of the KOS tagging crew in Long Beach. Mourners gathered at the home of brothers David Huizar, Ricardo Huizar (Ricky), and Juan Carpio at the corner of 20th Street and Myrtle Avenue. Several people were sitting on the front steps of the house. Maria Huizar, the mother of the brothers, was inside the house, as were several members of Presidio's gang. The house is located in Barrio Pobre gang territory.

Maria Alarcon, who was walking down 20th Street, witnessed the shooting. She saw a man, on foot, shoot at the group of people in front of the Huizar home, which was about a half a block away. Alarcon could not tell whether the pistol the man was holding was wrapped in a towel or a sheet. Alarcon hid in some bushes and saw the man run toward a waiting white car parked on Myrtle driven by a woman. Alcaron observed that the woman was thin with shoulder length curly hair. The car drove away quickly, went down an alley, and turned on 20th Street. Alarcon was worried about her children, and she ran down the same alley towards her house. After she made sure her children were safe at home, she went back through the alley to the Huizar house. When the white car went by again about five minutes later Alarcon could see it was the same woman. She could see the woman's face.

---

[2] The action was originally commenced by a felony complaint filed on May 24, 2010.

3

Mandi Montez,[3] who was one of the guests at the wake, was shot in the leg. The shooter was on foot and shouted, "East Side Longo."[4] Case testified at the trial of Moreno, who was known as "Whisper," and identified him as the shooter.

Juan Carpio was sitting on the porch when he was shot. He heard someone yell "East Side Longo." Out of the corner of his eye he saw someone walking up at a quick pace. Carpio turned for a "split second" and saw a figure with a rifle or a long gun. He turned and ran around the corner of the house. When he came back to the front of the house he saw Montez, Valle, his brothers and Bandel lying on the ground. Carpio heard from 15 to 17 shots.[5] Carpio saw that Huizar had been shot in the buttocks. Bandel was lying on his back and gasping for air. Bandel tried to catch his breath and then he stopped breathing. Carpio had made it inside the house, but he had also been shot.

Maria Huizar, who was inside the house, was looking out the front screen door. She could tell the shots were coming from 20th Street (20th). She looked toward where she heard the shots and saw someone carrying a white bundle. Before the shooting she had seen a white car go by on Myrtle Avenue (Myrtle). The driver had light-colored shoulder length hair.

Esperanza Ramirez was living in the area of 20th and Myrtle. She heard gunshots. Ramirez ordered her daughters to get on the floor. She looked out the window and saw a car go down the alley. The driver was a woman and there was a male passenger. The woman's hair was not black.

### 2. Police Investigation

Police recovered ten .223-caliber expended bullet casings at the scene of the shooting. The murder weapon was never found.

The Bandel had four gunshot wounds. He had been shot in the abdomen, right arm, and chest.

---

[3] Throughout the record Mandi Montez is also referred to as Mandi Montez Case. We refer to her as Mandi Montez.

[4] Defendant is a member of the East Side Longo gang.

[5] On the night of the shooting he told police he heard nine shots.

Officer Timothy Cable of the Long Beach Police Department (LBPD) showed a six-pack to Alarcon and Ramirez; both women identified No. 3 (defendant) as the driver of the white car. Unlike the other photographs which were mug shots with a gray background, defendant's photo was a DMV photo with a blue background. At a live lineup, neither woman selected defendant as the driver of the white car.

About six to seven weeks after the shooting police arrested defendant and interviewed her. Defendant denied involvement in the shooting and denied knowing Moreno. At the time of the shooting defendant claimed to be at the home of her boyfriend.

Detective Hector Gutierrez of the LBPD went to defendant's home on May 20, 2010 to serve a search warrant. Police recovered four newspaper clippings from the house, one of which was about the Bandel shooting.

### 3. Wiretap Evidence

In a March 6, 2010 recording between defendant and an unidentified male, defendant boasts that "[she] used to run with the Malditos . . . all day. The Malditos those were my boys . . . that was my clique." Defendant talks about her "big homie" Whisper and how he taught her everything she knew. "[H]e's doing fucking life and I'm out here walking free. I owe that . . . like I told him I owe you my life homie. You took the fuckin blame for everything and I'm walking free . . . . [¶] . . . [¶] And ever since then it's been eighteen years."

On March 16, 2010 at 9:48 a.m., defendant told Jose Brito that Whisper had gotten caught with the gun and had taken all of the blame. Witnesses had picked her in the photo array, but did not identify her in the live lineup. Her boyfriend "Green Eyes" had given her a good alibi. In an earlier conversation defendant said, "So, for 18 years, since [Whisper has] been inside . . . I've been with him every fucking step of the way. Whatever he needs from me, I always come through."

On March 31, 2010, defendant spoke with Ruhani Bustamante, who asked her whether she remembered "Keeper" or "Creeper" from KOS who "got killed." Defendant responded, "Yeah, yeah. That was me and him." Defendant talked about how she used to be filled with

5

anger and hate, when she saw one of her enemies at the mall, she would spit at them. If they had a baby with them, she would throw the baby out of the car seat.

### 4. Other Evidence

The court took judicial notice that Moreno was convicted in June 1995 of the murder of Bandel, and the attempted murder of Huizar, Carpio, Valle, Montez, and Lerma.

## B. Defense Case

On May 8, 2010, Detective Hugo Cortes with the LBPD interviewed Alarcon. In the interview, Alarcon told them she was inside the house when she heard the shooting. Alarcon also told him that she first saw the white car was when the man got out of the car and began shooting. The car turned down the alley with a screeching of tires and passed through the alley again. Alarcon saw a woman driving the car and there were two men in it. The first time Alarcon saw the car the shooter was driving and the female was in the passenger seat.

Martin Flores, a gang expert, testified that gangs are composed of youths aged 13 to 24 and are territorial and race-based. A gang member's reputation will increase if they commit a violent crime for the gang, and a gang member's status in the gang increases by association with a gang's more senior members. A gang member who has avoided prosecution for a crime achieves higher status in the gang through bragging about the crime and can maintain a connection with other gang members who have been convicted. If a gang member is suspected of lying, their status will drop within the gang.

Sarah Savell owned a triplex property near 20th and Myrtle in Long Beach. At 3:45 p.m. on December 1, 1992, she heard gunfire. She saw a Hispanic man with a rifle wrapped in a towel. In the alley was a gray Honda Civic hatchback. The man got into the Honda's passenger seat and the car sped away.

Mr. Foch, Savell's former husband, was standing in the doorway of the apartment on the first floor when he heard firecrackers.[6] He saw a young man walking in the middle of the street with a rifle partially wrapped in a towel. The man got into a small gray car that was in

---

[6] At the time of defendant's trial, Foch was deceased. His testimony from Moreno's trial was read into the record.

the alleyway. The car drove away. Foch saw the driver from the rear and could tell he was male because of his build and his hair cut, which was not long.[7]

Maria Gloria Reyes was the mother of defendant's boyfriend at the time and the grandmother of defendant's child. She did not recall giving defendant an alibi, and did not know defendant had been arrested.

Dr. Robert Shomer, an expert in memory, perception and eyewitness testimony, testified that the accuracy of eyewitness identification decays after 24 hours, and is reliable about 50 percent of the time. A police officer conducting a photo lineup may influence the identification because he knows which photo is the suspect's photo. A photo with a different colored background is more likely to be chosen. Hypothetically, if someone identifies a person from a photo array but then fails to identify them at a lineup, the witness probably did not get a good enough look for an accurate identification.

The jury convicted defendant of all counts, set the degree of murder at second degree, and found not true the premeditation allegations on the attempted murder counts. The trial court sentenced defendant to an aggregate term of 35 years to life, consisting of 15 years to life for the murder count, the upper term of nine years on count 2, consecutive sentences of two years four months for the four remaining attempted murder counts, and a consecutive term of one year eight months on the shooting at an inhabited dwelling count.

## DISCUSSION

### I. Statute of Limitations

Defendant argues her convictions for attempted murder are time-barred because the complaint filed in 2010 charged premeditated attempted murder, an offense carrying no statute of limitations under section 799;[8] thus, while the premeditation allegation permitted

---

[7] Defendant attempted to introduce evidence at trial that Foch also stated to his wife at the time that he could see the driver and that the driver was male. The court excluded this evidence.

[8] Section 799 provides in relevant part, "Prosecution for an offense punishable by death or by imprisonment in the state prison for life or for life without the possibility of parole, or for the embezzlement of public money, may be commenced at any time."

the otherwise time-barred attempted murder charges to go to trial, once the jury found the premeditation allegations untrue, the six-year statute of limitations of section 800[9] applicable to offenses punishable by eight or more years barred continued prosecution of those counts. Defendant also argues the section 246 charge is time barred from the face of the information because the prosecution did not plead any facts to toll the statute.

Respondent argues that because both premeditated attempted murder and attempted murder are the same offense, a single statute of limitations applies, even though attempted murder is not punishable by life imprisonment because, as expressly set out in section 805, the statute of limitations for a particular offense is determined by "the maximum punishment prescribed by statute for the offense, regardless of the punishment actually sought or imposed."

### A. *Attempted Murder Counts*

"An accusatory pleading must allege facts showing that the prosecution is not barred by the statute of limitations." (*People v. Crosby* (1962) 58 Cal.2d 713, 724.) A defendant may assert the statute of limitations at any time as it is jurisdictional, and the issue thus may be raised for the first time on appeal. (*People v. Williams* (1999) 21 Cal.4th 335, 338–341.)

Statutes of limitations in criminal cases are generally based upon the offense committed and are tied to the seriousness of the offense. (*Anthony v. Superior Court* (2010) 188 Cal.App.4th 700, 707.)[10] "The use of seriousness of the crime as the primary factor in

---

[9] Section 800 provides, "Except as provided in Section 799, prosecution for an offense punishable by imprisonment in the state prison for eight years or more or by imprisonment pursuant to subdivision (h) of Section 1170 for eight years or more shall be commenced within six years after commission of the offense."

[10] "In 1981, in recognition of the fact 'that piecemeal amendment over the years had produced a scheme that was confusing, inconsistent, and lacking in cohesive rationale,' the Legislature referred the matter to the Law Revision Commission for comprehensive review. (*People v. Frazer* (1999) 21 Cal.4th 737, 743; Stats. 1981, ch. 909, § 3, p. 3443.) In 1984, the Legislature overhauled the entire scheme. (Stats. 1984, ch. 1270, §§ 1–2, pp. 4335–4337.) The revised scheme reflected the primary recommendation of the Law Revision Commission that the length of a 'limitations statute

8

determining the length of the applicable statute of limitations [is] designed to strike the right balance between the societal interest in pursuing and punishing those who commit serious crimes, and the importance of barring stale claims. [Citation.] (*People v. Turner*, *supra*, 134 Cal.App.4th at p. 1594.) This benchmark also serves the procedural need to provide predictability and promote uniformity of treatment. (*Ibid.*)

The basic felony statute of limitations is three years. (§ 801.) However, if a felony is punishable for a maximum term of eight years or more but less than life in prison, the statute of limitations is six years. (§ 800.) For a crime punishable by death or life imprisonment, there is no limitation on the commencement of prosecution. (§ 799.) Section 805, subdivision (a) further specifies that for the purpose of determining the applicable limitation period, "[a]n offense is deemed punishable by the maximum punishment prescribed by statute for the offense, regardless of the punishment actually sought or imposed. Any enhancement of punishment prescribed by statute shall be disregarded in determining the maximum punishment prescribed by statute for an offense." In addition, section 805, subdivision (b) provides, "The limitation of time applicable to an offense that is necessarily included within a greater offense is the limitation of time applicable to the lesser included offense, regardless of the limitation of time applicable to the greater offense."

Section 664, subdivision (a) provides with respect to attempted murder, in relevant part, "[i]f the crime attempted is . . . willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punished by imprisonment in the state prison for life with the possibility of parole. If the crime attempted is any other one in which the maximum sentence is life imprisonment or death, the person guilty of the attempt shall be punished by imprisonment in the state prison for five, seven, or nine years." Thus, an action for attempted premeditated murder maybe commenced at any time as it is governed by section 799. (*Anthony v. Superior Court*, *supra*, 188 Cal.App.4th at p. 705.) However, under section

---

should generally be based on the seriousness of the crime.' (17 Cal. L. Revision Com. Rep. (1984) p. 313.)" (*People v. Turner* (2005) 134 Cal.App.4th 1591, 1594.)

9

800, *Anthony* concluded that simple attempted murder would be governed by the six-year statute of section 800 because the maximum punishment exceeds eight years. (*Id.* at p. 704.)

Where one offense is a lesser included of another offense, but the statute of limitations has run on the lesser-included offense, the defendant may be charged with and prosecuted for the greater offense. However, if the jury acquits the defendant of the greater offense, the time barred lesser included offense must be reversed. (*People v. Morgan* (1977) 75 Cal.App.3d 32, 35–36, 40.) This concept is codified in section 805, subdivision (b). However, as explained in *People v. Bright* (1996) 12 Cal.4th 652, attempted murder and premeditated attempted murder are the same offense. Thus, attempted murder is not a lesser included offense of attempted premeditated murder, but premeditation constitutes a penalty provision that prescribes an increase in punishment. "A penalty provision is separate from the underlying offense and does not set forth elements of the offense or a greater degree of the offense charged." (*Id.* at pp. 661–662, 670.) *Bright* analyzed the issue for purposes of determining whether an acquittal on a premeditation allegation in an attempted murder charge precluded retrial under double jeopardy principles. (*Id.* at pp. 661–662.) In *People v. Seel* (2004) 34 Cal.4th 535, the court held that under *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348, 147 L.Ed.2d 435], the premeditation allegation of attempted murder is subject to the double jeopardy clause. (*Seel*, at p. 545.) *Seel* found that the premeditation allegation was the "'functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict.'" (*Id.* at p. 547.) We read *Seel*'s use of the phrase "functional equivalent" to leave intact *Bright*'s conclusion that a premeditation allegation under section 664, subdivision (a) constitutes a penalty provision. (Accord, *People v. Anthony*, *supra*, 188 Cal.App.4th at p. 706, fn. 4 [*Seel* disapproved *Bright* only to the extent *Bright*'s double jeopardy analysis had been overruled by the intervening case of *Apprendi*].)

Section 664 subdivision (a) nonetheless provides that two very different penalties apply to the offense of attempted murder, depending upon whether the attempted murder is committed with premeditation and deliberation. Arguably then, as *People v. Anthony*, *supra*, 188 Cal.App.4th 700 concluded, the statute of limitations of section 800 would apply to

10

attempted murder and section 799 would apply to attempted premeditated murder. Indeed, in spite of *Bright*'s holding that the two offenses are not greater or lesser included offenses of each other, we cannot ignore the plain language of sections 799 and 800, which are penalty-based statutes of limitations. As a result, we cannot read section 805, subdivision (a), directing that the statute of limitations is based upon the longest penalty applicable to an offense, to override the plain language of the specific statutes of limitations in section 799 and 800. The Legislature's intention that a six-year statute of limitations apply to attempted murder is manifest.

Our interpretation is further supported by the actualities of pleading and proof. If the prosecution here had charged defendant with attempted murder, the statute of limitations would have barred prosecution of the offense; yet the premeditation allegation permitted the charge to go to trial and as a result, when the jury acquired defendant on the premeditation allegations, the prosecution obtained convictions of a time-barred offense. This result, permitting conviction on simple attempted murder sustainable simply because a premeditation allegation was alleged, but not proved, ignores the principle that punishments should fit the severity of the offense. Thus, we conclude that where, as here, the jury acquits a defendant of a premeditation finding on an attempted premeditated murder charge and the statute of limitations has run on the attempted murder charge, the attempted murder convictions must be dismissed. Otherwise, the prosecution could do an end run around the bar of section 800 and charge all attempted murders as premeditated in order to avoid the statute of limitations and improperly obtain a time barred conviction.

Therefore, defendant's convictions of five counts of attempted murder must be reversed as time-barred.

### B. *Shooting at an Inhabited Dwelling*

Defendant contends her prosecution for shooting at an inhabited dwelling in count 7 must be dismissed because the offense carries a maximum term of seven years and is governed by the three-year statute of limitations of section 801; further, there is no evidence tolling the statute in the record and no evidence that she forfeited the issue because the issue

11

was not raised at trial. Respondent asserts we must remand the matter to the trial court for an evidentiary hearing to determine whether the prosecution was timely or the statute was tolled because the issue was not raised in the trial court.

Where "the charging document indicates on its face that the action is time-barred, a person convicted of a charged offense may raise the statute of limitations at any time. If the court cannot determine from the available record whether the action is barred, it should hold a hearing or, if it is an appellate court, it should remand for a hearing." (*People v. Williams*, *supra*, 21 Cal.4th at p. 341.) Here, because the issue was not raised below, although it appears that the offense is barred on the face of the pleading, we remand to the trial court to determine whether count 7 should be dismissed as time barred.

## II.     Wiretap

Defendant argues the prosecution failed to establish probable cause for the wiretap because it was based on unknown levels of hearsay from unidentified sources that were filtered through an informant of questionable reliability; further, the prosecution failed to make the requisite showing of necessity and failed to reasonably minimize the reception of non-pertinent calls. Defendant asks this court to review the sealed documents related to her motions to unseal the wiretap application, quash and traverse, and to suppress the wiretap evidence, and if we find prejudicial error, suppress the wiretap evidence.

### A.     *Factual Background*

The wiretap was initially authorized in February 2010 by Judge Larry P. Fidler as wiretap No. 09-180 in an unrelated LBPD narcotics investigation into the East Side Longos (ESL) street gang. During the wiretap, conversations were intercepted referring to defendant and regarding the murder of Esaul Villagrana, who had been killed on October 26, 2009.

On February 26, 2010, the court authorized release of information from this wiretap.

Based upon information in the wiretap, an 83-page affidavit and a five-page *Hobbs*[11] affidavit authored by Detective Richard Carr of the LBPD, the court issued wiretap order

---

[11] *People v. Hobbs* (1994) 7 Cal.4th 948 (*Hobbs*).

No. 10-39 on defendant's cell phone. The unsealed portion of the affidavits detailed that the purpose of the wiretap was to investigate nine shootings committed July 20, 2009 through January 30, 2010 with the same weapon, as well as ongoing criminal activity of the ESL gang. The affidavits stated that police showed CRI #1 pictures of defendant, and the informant said the informant knew defendant as "Happy" and that she collected "taxes" for the ESL gang from drug sales which took place in the neighborhood and that she was responsible for Villagrana's murder.[12]

Defendant was known to be a member of ESL and to hold a high-level position. Defendant had an altercation with Villagrana during which Villagrana struck defendant; as a result, defendant sought authorization from higher-level ESL members to have Villagrana killed. The CRI #1 previously provided information that had led to arrests and seizures of narcotics, and was deemed reliable.

Regarding the necessity for the wiretap, police had attempted or considered and rejected closed circuit television of defendant's home (too expensive, no audio), undercover agents (dangerous and impractical), trash searches (no opportunity for doing so yet and impractical because defendant's house shared trash containers with other houses), and no probable cause for a search warrant.

During conversations recorded on March 6, 12, 16, and 31, 2010, defendant made statements in which she admitted involvement in the December 1, 1992 murder. On April 2, 2010, based upon additional information obtained in the wiretap, the court extended the wiretap and additionally issued wiretap No. 10-62 authorizing interception of defendant's home telephone.

On June 1, 2012, defendant moved to suppress evidence obtained from the wiretaps, asserting that there was no probable cause and police made an inadequate showing of necessity. Defendant asserted that the affidavit lacked facts in support of her involvement in Villagrana's homicide as a targeted hit, that it was no more than a rumor conveyed through

---

[12] This information was set forth in Long Beach Detective Carr's March 5, 2010 affidavit.

13

the confidential informant, and did not add up to anything more than a random rival gang shooting. Defendant argued there was no reason why other less intrusive methods would not have yielded the information police sought. Defendant sought access to the entire affidavit upon which wiretap No. 10-39 was based.

At the September 5, 2012 hearing, the court conducted an in camera hearing with Detectives Carr and Mark Cisneros, using questions provided by defense counsel. The court concluded that the sealing order would remain in full force and effect, finding that there was a great danger to the informants should their identities be revealed, there was no suggestion of misrepresentation or material omissions, and found sufficient probably cause for the authorization of the wiretap.

After the in camera hearing, Detective Gutierrez, a wiretap monitor, testified during the wiretap, the monitor listens to the call and attempts to identify the callers. The callers used a lot of code, so sometimes it would take a few minutes to identify whether the call was relevant. If the call was not relevant, the monitor would minimize the call or close the recording and resume listening at a later time. Officer Felipa Baccari similarly testified it was difficult to identify the callers, to determine whether they were involved in the relevant criminal activity, and to determine their roles and relationships because the callers would speak in code. There were no specific rules for when to minimize a conversation that was not privileged, and Officer Baccari relied on common sense to minimize a call that was not pertinent. However, sometimes the conversation could go from nonpertinent to pertinent "in seconds." Thus, monitors had to listen carefully to the conversation and its context.

At the hearing, the court remarked, "asking these police officers to sit there and listen to this and these conversations is asking quite a bit of human beings, it really is," and observed that the officers were listening in real time and looking for evidence of gang association and activity. The court found that the conversations were adequately minimized, and denied defendant's motion.

14

### B.    Legal Principles

"'California law prohibits wiretapping,'" except as provided by statute.  (*People v. Leon* (2007) 40 Cal.4th 376, 383.)  Because the federal wiretap act "'establishes minimum standards for the admissibility of evidence procured through electronic surveillance,'" and "'state law cannot be less protective of privacy than the federal [wiretap] Act,'" California courts "may look for guidance to cases under title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 United States Code sections 2510 to 2520 (federal wiretap act), 'which "provides a 'comprehensive scheme for the regulation of wiretapping and electronic surveillance.'"'"  (*Id*. at p. 384; *People v. Jackson* (2005) 129 Cal.App.4th 129, 146–147.)  In applying the California wiretap statute, we therefore look to both federal and California law.  (*Jackson*, at pp. 146–147; see *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1204–1207.)

Section 629.70 provides that when a defendant has been identified as a result of a wiretap interception obtained under section 629.50 et seq., "the prosecution shall provide to the defendant a copy of all recorded interceptions from which evidence against the defendant was derived, including a copy of the court order, accompanying application, and monitoring logs."  (§ 629.70, subd. (b).)  Under both federal and state law, however, these disclosures are not mandatory in all circumstances.  Subdivision (d) of section 629.70 expressly authorizes the court to limit these disclosures "upon a showing of good cause."  And section 1054.7 provides that the court may deny discovery for "good cause," including possible danger to a witness or compromise to other investigations.  Federal law also recognizes a privilege requiring nondisclosure of "'the identity of persons supplying the government with information concerning the commission of crimes,'" unless the confidential informant is also a material witness on the issue of the defendant's guilt or innocence.  (*McCray v. Illinois* (1967) 386 U.S. 300, 308–310 [87 S.Ct. 1056, 18 L.Ed.2d 62], italics omitted.)

The procedures outlined in *Hobbs*, *supra*, 7 Cal.4th 948 to protect privileged information apply not only to search warrants, but also to wiretap authorization orders.  Relying on established precedent, *Hobbs* outlined the procedures courts should use to appropriately balance the justification for law enforcement's refusal to disclose privileged

15

information, on the one hand, with a defendant's right to discovery of the warrant's factual basis, on the other.  (*Id*. at pp. 971–973; see *People v. Luttenberger* (1990) 50 Cal.3d 1, 19.)  By their extension to wiretaps, the *Hobbs* procedures provide that the wiretap's supporting documentation may validly be withheld from disclosure only to the extent necessary to protect official information or an informant's identity.  (*Hobbs*, at p. 971; *Roviaro v. United States* (1957) 353 U.S. 53, 60 [77 S.Ct. 623, 1 L.Ed.2d 639]; *People v. Seibel* (1990) 219 Cal.App.3d 1279, 1296.)  "[A] criminal defendant's right to discovery is based on the fundamental proposition that the accused is entitled to a fair trial and the opportunity to present an intelligent defense in light of all relevant and reasonably accessible information."  (*Hobbs*, at p. 965.)  "Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to the fair determination of a cause, the privilege must give way."  (*Roviaro*, at pp. 60–61.)

The procedures outlined in *Hobbs*, *supra*, 7 Cal.4th 948 require that even upon a showing of possible inaccuracies in the supporting affidavit's evidence, the court's review of the privileged material must take place in camera, out of the presence of the defendant and the defendant's counsel.  (*Id*. at pp. 972–973.)  "This procedure will assure the defendant of a judicial check on possible police misrepresentations, while preventing both unfounded fishing expeditions and inadvertent revelations of the identity of confidential police informants."  (*People v. Luttenberger*, *supra*, 50 Cal.3d at p. 24; see *Hobbs*, at p. 966; *United States v. Henderson* (9th Cir. 2000) 241 F.3d 638, 645 [in camera hearing is favored procedure to determine whether disclosure is required].)

### C.    *Probable Cause, Necessity, and Minimization*

A wiretap must be supported by a finding of probable cause, necessity, and minimization.  A trial court's determination that the documentation supporting the wiretap authorization application is sufficient is entitled to substantial deference and is reviewed for abuse of discretion.  (*People v. Acevedo* (2012) 209 Cal.App.4th 1040, 1051.)  We defer to the trial court's express and implied factual findings that are supported by substantial

evidence. (*People v. Roberts* (2010) 184 Cal.App.4th 1149, 1171; *People v. Reyes* (2009) 172 Cal.App.4th 671, 683.)

1.    PROBABLE CAUSE

A wiretap may be ordered where affidavits establish certain factual elements. First, there must be probable cause to believe that an individual is committing one of a number of specified crimes, and that communications concerning the crimes will be obtained by the wiretaps. (§ 629.52.)

Defendant contends the wiretap did not establish probable cause to conclude defendant was guilty of Villagrana's murder, or guilty of any other crimes. First, the asserted probable cause was based upon numerous levels of hearsay from unknown sources and was filtered through an informant of questionable reliability who was attempting to avoid prosecution. Second, Detective Carr's affidavit did not provide probable cause because the affidavit did not relate whether the sources had witnessed any crimes or the origin of the source's knowledge about defendant's alleged criminal activities.

We disagree. The affidavit established probable cause to believe that defendant was involved in Villagrana's murder as well as other crimes. First, in addition to Detective Carr's affidavit, which demonstrates that CRI #1 was deemed to be reliable (he had been used as an informant and his information had led to arrests and charges filed on narcotics offenses), our review of the sealed portions of the transcript confirms the informant's reliability. Second, given the reliability of the informant's information, the affidavit established defendant was a high-level member of ESL and involved in overseeing its drug trade and would rely on murder as a way of enforcing the gang's hegemony in its territory. Thus, probable cause existed to order the wiretap of defendant's phone.

2.    NECESSITY

Defendant argues law enforcement failed to make the required showing of necessity that continuing to use obvious techniques, such as continuing to speak to CRI #1, or monitor the already existing wiretap No. 09-180, were insufficient to build a case against her.

17

A wiretap is necessary where "[n]ormal investigative procedures have been tried and have failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous." (§ 629.52, subd. (d).) This necessity requirement ensures that wiretapping is not routinely used as an initial step in a criminal investigation or when traditional investigative techniques would expose the crime. (*People v. Leon, supra*, 40 Cal.4th at p. 385.) The necessity requirement is met if the affidavit "analyze[s] with particularity the limitations of each alternative investigative technique in achieving the goals of [the] investigation" and shows that ordinary investigative procedures, employed in good faith, are unlikely to be effective in the case. (*Id*. at pp. 385, 389–390.) "'Traditional investigative techniques" include surveillance, infiltration or undercover work, questioning of participants, execution of search warrants, and the use of pen registers and trap-and-trace devices.'" (*People v. Roberts, supra*, Cal.App.4th at p. 1172.) ""The government need not exhaust or explain its failure to exhaust every conceivable investigative procedure before resorting to wiretapping."" (*Leon*, at p. 395.) "[A] finding of necessity by the judge approving the wiretap application is entitled to substantial deference." (*Id*. at p. 385.)

Here, the record supports the trial court's conclusion that Judge Fidler's finding of necessity did not contravene the Fourth Amendment or section 629.52, subdivision (d). Detective Carr's affidavit sets forth that detectives had interviewed witnesses and victims, conducted photographic lineups, analyzed crime scene evidence, conducted surveillance, and interviewed a confidential informant. On the other hand, witnesses were uncooperative, and initiating search warrants, parole searches, and police feared investigative tools other than a wiretap might tip of those involved to the investigation. Thus, of necessity, the investigation into the ESL gang's activities required covert operations. Police had done all the nonwiretap investigation possible. As Detective Carr's affidavit detailed, other nonwiretap avenues were not and did not seem likely to become productive, and that alternative techniques would not expose any crimes.

18

3. MINIMIZATION

Defendant contends the wiretap was insufficiently minimized to avoid the interception of nonpertinent calls. Here, two of the 13 call monitors testified there were no set guidelines for minimization, while defense exhibit D[13] demonstrates that not all calls were adequately minimized because, for example, they captured completely irrelevant information, such as wedding preparations. We find adequate minimization under the circumstances.

Section 629.58 requires that "[e]very [wiretap] order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted so as to minimize the interception of communications not otherwise subject to interception under this chapter, and shall terminate upon attainment of the authorized objective, or in any event at the time expiration of the term designated in the order or any extensions." (§ 629.58.) "The government is required to adopt reasonable measures to reduce the interception of conversations unrelated to the criminal activity under investigation to a practical minimum while permitting the government to pursue legitimate investigation. The standard for minimization is reasonableness. Reasonableness is determined from the facts of each case." (*People v. Roberts*, *supra*, 184 Cal.App.4th at p. 1174.)

"To determine whether the authorities acted reasonably to minimize the interception of nontargeted communications, the court generally reviews a variety of factors relevant to the facts of the case. These factors may include whether a large number of the calls were very short, one time only, or in guarded or coded language; the breadth of the investigation underlying the need for the wiretap; whether the nonminimized calls occurred early in the surveillance; and the extent to which the authorizing judge supervised the ongoing wiretap." (*People v. Roberts*, *supra*, 184 Cal.App.4th at p. 1174.) "Other factors may include uncertainty as to scope of the alleged conspiracy, whether the conversations are between coconspirators, and whether the telephones used were public or private telephones." (*Ibid*.)

---

[13] A copy of the wiretap call logs showing their individual durations is attached to defendant's opening brief on appeal.

19

Where calls include coded information, however, it may be difficult to ascertain when the subject matter of the call has turned to irrelevant topics. Thus, law enforcement "can hardly be excepted to know that the calls are not pertinent prior to their termination." Further, surveillance is justified to determine the scope of what is thought to be a widespread criminal enterprise. (*Scott v. United States* (1978) 436 U.S. 128, 140 [98 S.Ct. 1717, 56 L.Ed.2d 168].) In such case, the percentage of nonpertinent calls may be relatively higher, yet their interception remains reasonable. (*Ibid.*)

Here, contrary to defendant's assertions, the officers acted reasonably. Given the investigation was focused on gang-based motivation for the offenses and the suspected ongoing criminal gang activity in the area, and the callers used code, the officers were required to listen to longer portions of the conversations to determine whether they were relevant. As Detective Gutierrez testified, the moment he determined a conversation was not pertinent, he would close out the call.

### D. Review of Sealed Documents

Defendant has requested that we review the sealed reporter's transcript of the in camera hearing to determine whether the government complied with its discovery obligations; whether the trial court properly permitted the prosecutor to testify in camera concerning how its office submitted the six-day reports to the judge issuing the wire taps; and whether the government complied with section 629.60 by presenting sworn, competent evidence establishing the reports were timely submitted to and reviewed by Judge Fidler.

We have reviewed the sealed transcripts of the in camera hearings conducted concerning the wiretap order, and find that law enforcement complied with the law in all respects in obtaining the wiretap order.

## III. Evidentiary Error

### A. Defendant's Violent Childhood Propensities

Defendant contends the trial court erred in admitting evidence of her statements that as a teen, she would go to the mall and assault rivals and their infant children. She contends those statements were irrelevant and prejudicial because they created the impermissible

20

inference that because she was a callous and violent teen, she was likely to assist in the charged coldblooded shootings of innocent people. Respondent argues the evidence was admissible to prove the common motive and intent of the prior bad act and the current charge, namely, defendant's desire to attack rival gang members.

>    1.    FACTUAL BACKGROUND

Over objection, the prosecution introduced evidence of defendant's conversation with Bustamante in which she bragged about being a violent teenager. In detail, the conversation contained the following dialogue:

Sedillo: "We were . . . I'm telling you, we were stupid. You know, let me tell you how stupid I fucking used to be, and now I feel like . . . not that I feel like . . . I don't feel remorseful and shit, because, you know, at that time I fucking, I had so much fucking anger and hate in me. I hated my enemies with a passion, I mean . . . I was fucking . . . [¶] . . . [¶] mean, I was fucken, very passionate about my gang banging, you know? [¶] . . . [¶] You know? And fucking . . . I was so stupid fool. . . . I used to have my daughter with me . . . . I would be at the mall, fucken mobbing, like it was the shit to do, like . . . I mean . . . like stupid ass bitch, I was like what a fucking dumb bitch, man . . . . [¶] . . . [¶] Now, I was like what the fuck? But . . . this is how stupid I was, I was fucking mobbing and at the motherfucking mall out with the motherfucking car seat and shit, you know. [¶] . . . [¶] And, then I would see one of my enemies, I would put the baby down and told Shorty and fucken Crawl, I'll be like, 'hey watch the kid.' And, fucking go and just fucking mock them, and I'll be like, 'East side long bitch.' And bam! Just fucking hit the bitch, you know? [¶] . . . [¶] Fuck BST bitch, fuck [unintelligible]. I'm from 'Eastside Longo bitch!' and then I be like bum! And, fucken knock that bitch out. And, fucking just go stand in line like what about my business . . . 'that's a fucking enemy bitch right there, what's up.' [¶] . . . [¶] You know were [sic] you at bitch? You know were [sic] you at? Hell yeah, I know where I . . . Say it bitch, where you at . . . alright bitch. Fucken spit on that bitch. [¶] . . . [¶] And then, if she had a kid with her? I would throw out the baby out of the fucken car seat. I would throw the baby like a fucking stroller. [¶] . . . [¶] I was scandalous. . . ."

2.    DISCUSSION

Evidence of uncharged misconduct is relevant to establish motive, intent, and absence of accident. (Evid. Code, § 1101, subd. (b); *People v. Ewoldt* (1994) 7 Cal.4th 380, 393.) Thus, evidence of uncharged misconduct may be admissible to establish common design or plan, intent, or identity, if a sufficient similarity exists, in nature and degree, between the uncharged misconduct and the charged offense. (*Ewoldt*, at p. 402.) "In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant "'probably harbor[ed] the same intent in each instance." [Citations.]'" (*Ibid.*) Nonetheless, the probative value of the evidence of the uncharged misconduct must outweigh the probability that its admission would create substantial danger of undue prejudice, of confusing the issues or misleading the jury. (Evid. Code, § 352.)

We review a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352 for abuse of discretion. (*People v. Fuiava* (2012) 53 Cal.4th 622, 667–668.)

Here, both the charged offenses and the incidents at the mall occurred while defendant was a teenager and consisted of acts of hostility towards others. Thus, defendant's statements during the taped conversation were highly relevant to establish defendant's enmity towards rival gang members. Further, both crimes show that defendant was motivated by an extreme degree of animosity toward gang rivals and she would resort to violent means to express that animosity. The incidents were relatively similar: Defendant would go to extreme measures to demonstrate her hatred; at the mall in public she would overturn baby strollers with small children, and at a funeral wake she would assist in the indiscriminate shooting of innocent persons.

Even assuming error in the admission of these statements, any error was not prejudicial. Defendant made sufficient statements regarding her culpability for the shootings with which she was charged to support the jury's verdicts. The wiretaps show that defendant consistently bragged about her participation in the shooting at Presidio's wake. Thus, even without hearing about defendant's assaults on rivals at the mall, the jury would not have

22

acquitted her.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 998–999; *People v. Watson* (1956) 46 Cal.2d 818, 836), or the elevated standard that governs federal rights (*Crane v. Kentucky* (1986) 476 U.S. 683, 690–691 [106 S.Ct. 2142, 90 L.Ed.2d 636]; *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705]).

### B.      Admission of Wiretap Statements

Defendant argues the trial court erred in admitting the evidence of the fact that her phone was the subject of the 2010 wiretap order because this fact implied there was credible proof defendant was involved in other criminal activity—namely, the Bandel murder.  Thus, because the jury was not required to determine whether the conversations were obtained legally, such evidence was irrelevant and prejudicial.  Respondent contends that the claim was forfeited by defendant's lack of objection in the trial court; the evidence established that the wiretap was obtained legally; and the testimony was brief and did not state that defendant was the subject of the wiretap.

### 1.      FACTUAL BACKGROUND

Defendant moved to exclude the testimony of Detective Carr that defendant was the subject of a wiretap.  Defendant pointed out that she had agreed to stipulate that the conversations were intercepted pursuant to a court-ordered wiretap, and argued that Detective Carr should only be permitted to testify that the wiretap had been set up.  The court indicated it was inclined to agree with defendant.  The prosecution stated that the purpose of Detective Carr's testimony was to establish that there was a lawful order for the wiretap.  The court admonished that the prosecution could not state that defendant was the target of the wiretap, but ruled that the prosecution could state that the wiretap was on her phone and it was a lawful wiretap order.

Over this objection, Detective Carr testified that police had obtained a court order in order to wiretap private phone lines.  Detective Carr obtained an order to listen to defendant's phone.

23

## 2. DISCUSSION

Here, the testimony was relevant as foundational material but only insofar as it explained the conversations were lawfully obtained. Detective Carr went beyond that because although he did not identify defendant as the "target," his testimony stated that her phone was the subject of the wiretap. Thus, the testimony created a strong implication that defendant was already engaged in criminal activity. (See, e.g., *United States v. Cunningham* (7th Cir. 2006) 462 F.3d 708, 712 [procedures used in wiretaps not relevant to issue of guilt or innocence and suggested defendant participated in crimes].)

However, the admission of the testimony was not prejudicial because as discussed above, defendant made sufficient statements regarding her culpability for the shootings with which she was charged to support the jury's verdicts. The wiretaps show that defendant consistently bragged about her participation in the shooting that had taken place at Presidio's wake.

## C. *Judicial Notice of Moreno's Conviction as the Shooter*

Defendant argues the trial court erred in taking judicial notice of Moreno's conviction as the shooter because although the ostensible purpose of the evidence was to confirm defendant's statements in the wiretapped conversations that Moreno had been convicted, the jury was not instructed how to evaluate the conviction, and the evidence proved Moreno's intent, thus making it easier for the jury to infer defendant shared his goal of killing the victims.

## 1. FACTUAL BACKGROUND

Defendant objected to the trial court taking judicial notice of Moreno's conviction, contending that his conviction was not something for the jury to review and that the identification evidence of defendant in the current case was weak, and as a result the prosecution needed to establish that Moreno was the shooter. The trial court took judicial notice of Moreno's convictions, and that he had been sentenced to prison for "at least life." The jury was not instructed on the use of this conviction.

24

## 2.    DISCUSSION

We agree that Moreno's conviction was not relevant to prove defendant's guilt. Evidence about the conviction of a coconspirator is not admissible as substantive proof of the guilt of a defendant. (*United States v. Mitchell* (4th Cir. 1993) 1 F.3d 235, 240; see *People v. Young* (1978) 85 Cal.App.3d 594, 601–602 [court erred by informing the jury over defense objections that a codefendant had pleaded guilty].) Indeed, guilt by association offends state constitutional principles. (*People v. Galloway* (1979) 100 Cal.App.3d 551, 563; *People v. Castaneda* (1997) 55 Cal.App.4th 1067, 1071–1072 [profile evidence improperly invites a finding of guilt by association and undermines a defendant's right to a fair trial].)

Here, however, although the evidence was apparently not proffered on the direct issue of defendant's guilt (no instruction to the jury was given concerning the use of the evidence), evidence of Moreno's conviction was necessary to explain to the jury the context of defendant's bragging in the wiretapped conversations. This theory relies on the fact of Moreno's conviction for its utility. Thus, admission of the evidence was not error. Even if it were error, it was not prejudicial because at trial, witnesses made numerous references to Moreno's status as the shooter and Moreno's trial and conviction throughout defendant's trial and thus the evidence came in, unobjected to, in other guises, and defendant herself in the wiretaps made numerous references to Moreno's conviction.

### D.    *Exclusion of Foch's Testimony That the Driver of the Honda Was Male*

Defendant argues that the trial court erred in excluding Foch's testimony given at Moreno's trial that the driver of the getaway Honda was male. She argues that her failure to disclose this evidence, which came to light in a police interview with Savell, should be excused because Savell testified as a witness at trial. The People contends the evidence was properly excluded as cumulative and hearsay, and not disclosed to the prosecution in a timely manner.

#### 1.    FACTUAL BACKGROUND

Defendant moved to introduce at trial the evidence that Foch stated, under the excitement of the incident, to his then-wife Savell as they drove away from the scene that

25

Foch had seen the getaway driver, and that the driver was male. The court observed that the testimony was consistent with Foch's testimony at Moreno's trial and that this prior testimony was going to be read into the record. The prosecution stated it was the first time it had heard about the statement. Defense counsel responded that the police had recently interviewed Savell and counsel assumed the prosecution was aware of this statement. Defendant also argued the evidence was admissible as a spontaneous utterance. The court sustained the prosecution's objection on the basis the evidence had not been disclosed to the prosecution.

### 2. DISCUSSION

Here, the evidence was cumulative to Foch's testimony that he observed the driver of the getaway car was male based upon his hair and his build. As a result, the exclusion of the evidence was not error because the jury already had Foch's testimony before it.

### E. Exclusion of Photographs of Defendant near Time of Shooting Which Established She Did Not Fit Eyewitness Descriptions

Defendant argues the trial court erred in excluding photographs taken near the time of the shooting that established she did not have shoulder length light-colored hair.

### 1. FACTUAL BACKGROUND

The prosecution admitted into evidence exhibit 2, the six-pack photo array Alarcon and Ramirez used to identify defendant shortly after the shooting. The DMV photo of defendant does not show the length of defendant's hair or the date the photo was taken. In addition to the DMV photo, the court admitted four photos of defendant at her live lineup in March 1993 that showed defendant's hair was brown and longer than shoulder length. Defendant sought to introduce four photos she contends were taken around the time of the shooting that show she had waist-length black hair. These photos showed defendant holding her young child (aged three to four months), and the photos were all taken within several months to a year of the shooting. The prosecution objected because one of the photos showed defendant with a small child. The court found that the prosecution's photographs were sufficient evidence of the length and color of defendant's hair, and excluded defendant's proffered photographs. Defense counsel used the admitted photographs to argue that her hair

26

was longer than shoulder length at the time of the shooting, and that one of the witnesses saw a female driver with blond hair.

## 2. DISCUSSION

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Typically, the application of Evidence Code section 352 to defense evidence does not infringe on a defendant's constitutional rights. (*People v. Cunningham*, *supra*, 25 Cal.4th 926, 998.) But the statute "must yield to a defendant's due process right to a fair trial and to the right to present all relevant evidence of *significant* probative value to his or her defense. [Citation.]" (*Id*. at pp. 998–999.) "Although completely excluding evidence of an accused's defense theoretically could [violate these rights], excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. [Citation.] If the trial court misstepped, '[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense.' [Citation.]" (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103.)

Here, the photographs showing defendant with her child were unduly prejudicial because they tended to arouse sympathy for her as a mother. Further, they were cumulative to the prosecution's photographs showing the length and color of defendant's hair at the time of the shooting, and defendant was not prevented from arguing that she was not the driver of the white car based on the varying witness descriptions that did not match her photographs. For this reason, the exclusion of defendant's proffered photographs was not prejudicial.

### F. *Exclusion of False Statements Defendant Made About Having Cancer*

Defendant argues the trial court erred in excluding false statements she made in the wiretaps that she had cancer. She sought to introduce them to call her own credibility into question and to establish she often fabricated statements.

27

1.    FACTUAL BACKGROUND

Nurse Leilani Rodriguez Knopp testified at a pretrial hearing that she discharged defendant from the hospital on April 14, 2010. Defendant was suffering from gastritis. There was no mention in defendant's discharge paperwork that she had cancer. However, in phone calls wiretapped between April 11, 2010 and April 14, 2010, defendant told different people, including Brito, that she had been diagnosed with cancer and needed a hysterectomy. Defendant erroneously believed that a condition she suffered from, "uterine fibrosis," constituted uterine cancer.

The trial court observed, in response to defendant's proffer of this evidence, that "it is not clear to me that she is telling lies in here. She was ill enough to go to the emergency room on the 13th, sometime after 8:00 p.m. . . . And on the 11th, there are four calls on the 11th. She seems to complain of cysts and fibrosis with cancer. And maybe that's what she thinks it is. And it is a misunderstanding. [¶] . . . She moves easily between the words 'cancer' and 'cyst' and 'fibrosis' and 'hysterectomy.'" The court stated it did not find the evidence to be admissible under Evidence Code section 352, finding that it did not establish that defendant was a "chronic liar."

2.    DISCUSSION

Contrary the defendant's contentions, the trial court did not abuse its discretion in excluding this evidence as not tending to prove the point in question. (See *People v. Jablonski* (2006) 37 Cal.4th 774, 805.) That the evidence tended to establish defendant was a liar was equivocal at best. Although the nurse did not mention cancer, defendant may have assumed on her own that her condition might be cancerous. Even assuming its exclusion was error, it is not reasonably probable the result at trial have been different. Defendant took the opportunity during argument to argue at length why her wiretapped conversations were not worthy of belief. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

**IV.    Sufficiency of the Evidence and Instructional Error**

**A.    *Sufficiency of Evidence That Defendant Intended to Aid and Abet Murder and Attempted Murder***

Defendant contends that the prosecution failed to establish that before or during the crimes, defendant formed the intent to help Moreno commit the specific offenses charged in the information; as a result, she was at most an accessory after the fact.  Defendant points to Alarcon's testimony that defendant was sitting in the driver's seat of the car near where Moreno was shooting at the victims, yet there was no evidence of what occurred before that moment and thus no evidence of what Moreno and defendant discussed before the shooting.  At most, the jurors here could have inferred that defendant learned the full scope of Moreno's plan when he got into the car to make his escape, which occurred *after* the shooting.

"A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime."  (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.)  Mere presence at the crime scene is, by itself, not aiding and abetting, but it can be one factor among others that support conviction as an aider and abettor.  (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5.)  "Among the factors which may be considered in determining aiding and abetting are:  presence at the crime scene, companionship, and conduct before and after the offense."  (*Ibid.*)  The intent to aid and abet may form before or during the perpetrator's commission of the crime.  (*People v. Montoya* (1994) 7 Cal.4th 1027, 1039.)

Here, there was substantial evidence from which a rational jury could conclude defendant intended to aid and abet Moreno's murder of Bandel and attempted murder of four others.  Moreno used a rifle wrapped in a towel or sheet, which would have been very conspicuous to carry in the Honda; the car drove by with both Moreno and defendant before the shooting, implying they were surveilling the Huizar home; defendant sat in the car while the shooting took place and when Moreno came back to the car, sped away, implying she

knew what he had done; and the recorded phone calls demonstrate defendant's intent to aid and abet. (Cf. *Juan H. v. Allen* (9th Cir. 2005) 408 F.3d 1262, 1267, 1278–1279 [defendant did not aid and abet when he said nothing while at the crime scene, made no gestures, and did not otherwise encourage perpetrator].)

### B. Sufficiency of the Evidence that Defendant Intended to Kill the Victims in Counts 2 Through 6

Defendant asserts that the evidence is insufficient that she intended to kill each of the named victims of the attempted murder counts because her intent had to be established with respect to each victim; here, there is no evidence defendant knew ahead of time who or how many people were at the Huizar home before the shooting.

As we have concluded that defendant's convictions on these offenses was time-barred and must be reversed by the trial court, we need not consider the sufficiency of the evidence to support them.

### C. Adequacy of Instruction on Intent to Aid and Abet the Crimes

Defendant argues the trial court erred in instructing on aiding and abetting with CALJIC No. 3.01 because the instruction given did not inform the jury that she had to form the intent to aid and abet before or during the commission of the shooting, as is explained in CALCRIM No. 401. The court had a sua sponte duty here to clarify the instruction because the evidence only supported the inference that she formed the intent to aid Moreno at the time of the escape, when the shooting had been completed. She contends the error was of federal constitutional magnitude and prejudicial because it failed to inform the jury it must find the requisite intent.

#### 1. FACTUAL BACKGROUND

The trial court instructed the jury with CALJIC No. 3.01, which defines aiding and abetting: "A person aids and abets the [commission] [or] [attempted commission] of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice, [or, by failing to act in a situation where a person has

30

a legal duty to act,] aids, promotes, encourages or instigates the commission of the crime." CALCRIM No. 401 adds the key language that "[b]efore or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime."

2. DISCUSSION

In *People v. Esquivel* (1994) 28 Cal.App.4th 1386, the court held that the trial court erred in a robbery prosecution on an aiding and abetting theory in failing to instruct sua sponte that the defendant had to form the intent to aid and abet before the offenses took place. "[A]n aider and abettor should not be held liable for a homicide committed before he became an accomplice. In either instance, the defendant's later joinder does not aid or encourage the commission of the homicide." (*Id.* at p. 1396.) "'[I]nadequate instructions on intent are closely related to instructions that completely remove the issue of intent from the jury's consideration, and, as such, they constitute federal constitutional error.'" (*Id.* at p. 1399.) We therefore must "determine whether the instructional ambiguity is harmless beyond a reasonable doubt under the *Chapman* [*v. California*, *supra*, 386 U.S. 18] standard." (*Ibid.*)

Here, the court erred in failing to instruct that the intent to aid and abet needed to be formed prior to the shootings. Given the skimpy evidence on events leading up to the shooting, the jury needed to be instructed to focus on those facts which would support an inference that defendant formed the intent to aid and abet before the crimes. However, the error is harmless beyond a reasonable doubt. CALJIC No. 3.01 is phrased in the present tense ("aids, promotes, encourages or instigates the commission of the crime") and requires that the defendant have knowledge of the perpetrator's intent when the defendant so acts. If defendant is acting in the present tense, it follows necessarily that the intent to aid and abet had to be formed *before* the defendant acted. Thus, even with the omission in the given the instruction, under the facts of this case—defendant waiting in the getaway car while Moreno approaches the Huizar home with a rifle—it is not reasonably likely the jury concluded that defendant only formed the intent to aid Moreno *after* he had shot the victims.

31

## V. Cumulative Error

Defendant argues that even where no single error compels reversal, here the trial court's "lopsided" evidentiary rulings and instructional errors rendered the trial unfair.

In examining a claim of cumulative error, the critical question is whether defendant received due process and a fair trial. (*People v. Cain* (1995) 10 Cal.4th 1, 82.) A predicate to a claim of cumulative error is a finding of error. There can be no cumulative error if the challenged rulings were not erroneous. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1382 [no cumulative error where court "rejected nearly all of defendant's assignments of error"].) Our review of the record assures us that defendant received due process and a fair trial. (See *People v. Fuiava*, *supra*, 53 Cal.4th at p. 716.)

## VI. Trial Court Bias in Deciding New Trial Motion

Defendant argues that the trial court's admitted bias against eyewitness experts rendered it incapable of ruling on her new trial motion, and that the error was structural and requires reversal regardless of whether an unbiased judge would have reached the same conclusion.

### A. Factual Background

Defendant moved for a new trial on the grounds that she was denied her right to a fair trial and denied the effective assistance of counsel, arguing that insufficient evidence supported the verdict, and the exclusion of her statements she had cancer and that Foch had told Savell the driver of the car was male was error.

During argument, the court told defendant's counsel, "Your eyewitness testimony, the expert, created, perhaps, some problems with the photo display as it was shown. I have very little faith or respect for these identification experts. I think our appellate courts and trial courts have given to them a license to make just a ton of money. [¶] If you will recall, Dr. Shomer told us in the previous year he had made one hundred thousand from PACE payments alone for what I think is canned testimony."

## B.      Discussion

A court may grant a new trial when the verdict is contrary to the evidence. (§ 1181, subd. (6).) "The court extends no evidentiary deference in ruling on a section 1181[, subdivision] (6) motion for new trial. Instead, it independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt *to the judge*, who sits, in effect, as a '13th juror.' [Citations.]" (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133.) Pursuant to *People v. Robarge* (1953) 41 Cal.2d 628, "the court, on [an 1181, subd. (6)] motion for a new trial, should consider the probative force of the evidence and satisfy itself that the evidence as a whole is sufficient to sustain the verdict. [Citations.] . . . [I]t should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict. [Citations.]" (*Robarge*, at p. 633; see *Porter*, at p. 133.)

As explained in *People v. Cowan* (2010) 50 Cal.4th 401, "a constitutionally intolerable probability of actual bias exists only when the circumstances '"would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused."' [Citation.] This inquiry is an objective one, based on whether '"under a realistic appraisal of psychological tendencies and human weakness," the interest "poses such a risk of actual bias and prejudgment that the practice must be forbidden."' [Citation.]" (*Id.* at p. 457.)

The trial court's comments here do not evidence actual bias but are rather reflective of its assessment of witness credibility, a permissible task for the court sitting as a 13th juror on a new trial motion under section 1181. The court observed in ruling on the motion that although the expert had "created . . . some problems" with the photo display through his testimony, the judge also observed that the expert was a paid witness, as the expert himself admitted. Thus, although the court was forthright that it was skeptical of paid experts, this candor, when evaluated under the circumstances of the court's ruling, did not indicate it based

33

its evaluation of the evidence on anything other than credibility.  We find no abuse of discretion.

## VII.    Sentencing Error

Defendant contends that her sentence of 35 years to life constitutes cruel and unusual punishment because it was a functional life without parole sentence—she will not be eligible for parole until after she is 70 years old.  She also contends the trial court erred in sentencing her to the upper term on count 2 because it relied on aggravating factors (premeditation) not found by the jury.

We do not consider defendant's arguments because we conclude that defendant's convictions on the five attempted murder counts must be dismissed on remand, and the court must determine whether defendant's conviction for shooting at an inhabited dwelling is time-barred, the trial court is directed on remand to resentence defendant.

## DISPOSITION

The judgment of conviction is affirmed as to count 1 (murder), reversed as to counts 2 through 6 (attempted murder) and remanded for a determination of whether the statute of limitations has expired on count 7 (shooting at an inhabited dwelling).  If the statute has expired, the trial court is directed to dismiss that count.  The trial court is directed to resentence defendant and forward an amended abstract of judgment to the Department of Corrections and Rehabilitation.

CERTIFIED FOR PUBLICATION.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


CHANEY, J.

34