Filed 9/23/20  P. v. Tardy CA3
Opinion following transfer from Supreme Court

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C086572 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE015244) |
| v. | OPINION ON TRANSFER |
| DAMIEN LEE TARDY, | |
| Defendant and Appellant. | |

In the early morning hours of August 2, 2016, defendant Damien Lee Tardy shot a man in the face and shoulder at close range. Shortly thereafter, defendant shot the man three more times as he was on the ground attempting to crawl away. Remarkably, the man survived. Following a jury trial, defendant was found guilty of willful, deliberate, and premeditated attempted murder. (Pen. Code, §§ 187 subd. (a), 664, subd. (a).)[1] The

---

[1] Undesignated statutory references are to the Penal Code.

1

jury also found that he personally used, personally and intentionally discharged, and proximately caused great bodily injury with a firearm. (§§ 12022.5, subd. (a), 12022.53, subds. (b), (c), & (d).) The trial court sentenced him to an aggregate term of 32 years to life in state prison.

In February 2020, we affirmed the judgment in an unpublished opinion. (*People v. Tardy* (Feb. 7, 2020, C086572) [nonpub. opn.].) In doing so, we rejected defendant's contention that the evidence was insufficient to support a finding of attempted willful, premeditated, and deliberate murder. We also rejected defendant's contention that the judgment must be conditionally reversed and the matter remanded for the trial court to determine whether he is eligible for "pretrial" mental health diversion as authorized under recently enacted section 1001.36.

Our Supreme Court granted review but deferred further action pending disposition of *People v. Frahs* (2020) 9 Cal.5th 618 (*Frahs*). Following its decision in *Frahs*, the court transferred this matter back to us with directions to vacate our decision and reconsider the cause in light of *Frahs*. In *Frahs*, the court found section 1001.36 applies retroactively to defendants whose cases were not yet final when the Legislature enacted section 1001.36. (*Frahs*, at pp. 640-641.) The court further concluded a defendant need only argue he suffers from a qualifying mental disorder to be entitled to a limited remand to allow the trial court to conduct a mental health diversion eligibility hearing. (*Id*. at p. 640.) As we are bound by our Supreme Court's decision in *Frahs*, we will grant a limited remand for the purpose of determining defendant's eligibility for mental health diversion under section 1001.36. Our conclusion regarding the sufficiency of the evidence remains unchanged.

## FACTUAL BACKGROUND

On the morning of August 1, 2016, M.G. was suffering symptoms from heroin withdrawal. He approached a woman he did not know, Daisy Groh, near a motel on Stockton Boulevard in South Sacramento and asked her if she could help him obtain

heroin. After Groh placed two phone calls, a man arrived and supplied M.G. with a small amount of heroin. Before M.G. walked away, he told Groh that his girlfriend was expecting to receive some "government money" at midnight and indicated that he wanted to purchase more heroin at that time. Groh agreed to help M.G. and gave him her phone number.

Shortly after midnight on August 2, 2016, M.G. called Groh. When Groh answered, she was in a room at the motel with four individuals—her boyfriend, defendant, Vincent Cervantez, and another man referred to as Speedy. During the call, Groh agreed to connect M.G. with someone who could provide him with heroin and told him to come to the motel.

Upon his arrival at the motel around 12:30 a.m., M.G., who was dressed in all red clothes, was introduced to everyone in the room, including defendant. When asked, M.G. indicated where he was from and denied being in a gang, explaining that he just liked the color red. After purchasing $20 worth of heroin from Cervantez, M.G. left the motel.

Approximately 10 to 20 minutes later, M.G. called Groh and asked for his money back due to the poor quality of the heroin. He said that the heroin was "garbage." In response, Groh informed M.G. that Cervantez would refund his money if he came back to the motel.

When defendant learned about M.G.'s request for a refund, he was upset and mad at M.G. for disrespecting Cervantez by complaining about the quality of the heroin. There was also some additional tension between defendant and M.G. because M.G. was from a different neighborhood and belonged to a rival subset of the Bloods gang. According to Groh's boyfriend, both defendant and Cervantez had asked M.G. where he was from when he initially came to the motel. Groh's boyfriend explained that there was "some aggression behind [the conversation]." He described it as "almost intimidating." Although the conversation did not escalate into anything physical, there was "tension in the air" when it ended.

Before M.G. returned to the motel, defendant and Cervantez retrieved a handgun from Cervantez's car and announced that they were going to rob M.G. They indicated that they wanted to take the "government money."

When M.G. arrived at the motel the second time, he asked Cervantez to give him a ride so he could obtain better quality heroin. M.G. told Cervantez that he did not need a refund if Cervantez agreed to do so. Thereafter, M.G., Cervantez, and defendant left together in Cervantez's car.

Cervantez made several stops after leaving the motel. First, he drove to a residence and purchased crystal methamphetamine, which everyone in the car smoked. He then drove to several stores so that M.G. could get "cash back" to purchase heroin. After M.G. secured $60 or $70, Cervantez drove to a parking lot where M.G. purchased heroin. M.G. smoked heroin in the parking lot and during the drive to his residence. When they arrived, Cervantez parked on the street near the residence. M.G. rolled a "blunt" and talked with Cervantez for about 20 minutes. During the conversation, Cervantez agreed to pick M.G. up later. Defendant did not say anything.

As M.G. was getting out of the car, defendant asked Cervantez to open the trunk so he could get his sweater. At that moment, a bag M.G. was carrying ripped, spilling food in the car. After M.G. picked the food up (which he estimated took two or three minutes), he shook Cervantez's hand and then walked towards the back of the car. As soon as M.G. reached the trunk area, defendant shot him in the face. Defendant immediately shot M.G. a second time in the shoulder, causing him to fall to the ground. Shortly thereafter, defendant shot M.G. three more times as he was attempting to crawl away. When M.G.'s mother-in-law[2] came outside and said "hey, hey, hey," defendant and Cervantez got into the car and sped away.

---

[2] M.G. referred to his girlfriend's mother as his mother-in-law.

Police officers arrived at the scene around 3:35 a.m. Shortly after 4:00 a.m., M.G. was taken to the hospital by ambulance. M.G. received treatment and was admitted to the trauma intensive care unit.

A medical exam revealed that M.G. had five gunshot wounds. He was shot twice in his left shoulder and once in his mouth, neck, and right leg. After multiple surgeries, M.G. was released from the hospital on August 11, 2016.

At trial, M.G. explained that he and defendant did not have an argument prior to the shooting; he believed "things were cool" or "okay" between them. M.G. further explained that defendant was waiting for him behind the car with his gun drawn; it was pointed "right at [his] face." M.G. noted that he was not armed with a weapon and had not "use[d] any kind of violence" on defendant prior to the shooting.

## DISCUSSION

### 1.0 Insufficient Evidence

Defendant contends the evidence was insufficient to support a finding of attempted willful, premeditated, and deliberate murder. According to defendant, his conviction must be reversed because the shooting was "a rash, panicked, and unconsidered impulse; an explosion of violence, rather than preexisting reflection." We disagree.

#### 1.1 *Applicable Legal Principles*

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the

5

existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623; *People v. Pettie* (2017) 16 Cal.App.5th 23, 52.)  "[U]nlike murder, attempted murder is not divided into degrees.  The prosecution, though, can seek a special finding that the attempted murder was willful, deliberate, and premeditated, for purposes of a sentencing enhancement." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 605; see *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1049 ["attempted murder is not a lesser included offense of attempted premeditated murder, but premeditation constitutes a penalty provision that prescribes an increase in punishment"].)

"We do not distinguish between attempted murder and completed first degree murder for purposes of determining whether there is sufficient evidence of premeditation and deliberation." (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1462, fn. 8, disapproved on another ground in *People v. Mesa* (2012) 54 Cal.4th 191, 199.) " ' "In this context, 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " ' [Citation.] ' "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." ' [Citations.]  'The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' " (*People v. Potts* (2019) 6 Cal.5th 1012, 1027.)

"We normally consider three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported—preexisting motive, planning activity, and manner of killing—but '[t]hese factors need not be present in any particular

6

combination to find substantial evidence of premeditation and deliberation.' [Citation.] If the evidence of preexisting motive and planning activity by itself is sufficient to support the first degree murder conviction on a theory of premeditation and deliberation, we need not review the evidence concerning the manner of killing." (*People v. Jennings* (2010) 50 Cal.4th 616, 645-646; see *People v. Streeter* (2012) 54 Cal.4th 205, 242 [the three factors are not exclusive, nor are they invariably determinative; instead, they are simply intended to guide an appellate court's assessment as to whether the evidence supports the inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse].) "A first degree murder conviction will be upheld when there is extremely strong evidence of planning, or when there is evidence of motive with evidence of either planning or manner." (*People v. Romero* (2008) 44 Cal.4th 386, 401.)

    1.2    *Analysis*

Viewing the evidence in the light most favorable to the judgment, we conclude a rational trier of fact could have found, beyond a reasonable doubt, that the attempted killing of M.G. was willful, premeditated, and deliberate. The evidence that defendant went to the trunk of Cervantez's car a few minutes prior to the shooting and waited for M.G. with his gun drawn shows planning activity and that he had time to reflect upon his plan to shoot M.G. Further, there was evidence from which the jury could infer that defendant had a motive to shoot M.G. The evidence at trial showed that defendant was upset and mad at M.G. for disrespecting Cervantez by complaining about the quality of his heroin, including calling it "garbage." There was also evidence that there was tension between defendant and M.G. because M.G. was from a different neighborhood and belonged to a rival subset of the Bloods gang. Finally, the fact that defendant shot M.G., who was unarmed, in the face and shoulder at close range and then shot him three more times after M.G. fell to the ground and was attempting to crawl away showed a deliberate intent to kill. That there was no evidence of any provocation or struggle immediately

7

prior to the shooting supports an inference of a deliberate plan to kill. "The lack of provocation by the victim leads to an inference that an attack was the result of a deliberate plan rather than a 'rash explosion of violence.' " (*People v. Miranda* (1987) 44 Cal.3d 57, 87, disapproved on another ground in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4; see *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295 ["a close-range shooting without any provocation or evidence of a struggle . . . supports an inference of premeditation and deliberation"].)

## 2.0    Pretrial Mental Health Diversion

Defendant contends the judgment must be conditionally reversed and the matter remanded to the trial court to determine whether he is eligible for "pretrial" mental health diversion due to specified mental disorders under the recently enacted section 1001.36, which he argues is retroactive as to all cases not yet final. In support of his contention, defendant relies on the retroactivity rules of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*) and *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299 (*Lara*). Defendant additionally argues that equal protection principles require that the statute have retroactive effect.

Originally, we concluded that section 1001.36 did not have retroactive effect as to cases, like this one, that had already reached the stage of conviction (whether by jury or by plea) before the statute's effective date. However, pursuant to our Supreme Court's decision in *Frahs*, we now conclude defendant is entitled to limited remand to the trial court for a determination on his eligibility for mental health diversion under section 1001.36. (See *Frahs, supra*, 9 Cal.5th at pp. 640-641.) Section 1001.36 was enacted after defendant's sentencing (Stats. 2018, ch. 34, § 24, eff. June 27, 2018) and provides pretrial diversion may be granted if the trial court finds all of the following criteria are met: (1) the defendant suffers from a recently diagnosed mental disorder enumerated in the statute; (2) the disorder was a significant factor in the commission of the charged offense, and that offense is not one of the offenses enumerated in subdivision (b); (3) "[i]n the opinion of a qualified mental health expert, the defendant's symptoms of the

8

mental disorder motivating the criminal behavior would respond to mental health treatment"; (4) the defendant consents to diversion and waives his right to a speedy trial; (5) the defendant agrees to comply with treatment as a condition of diversion; and (6) the defendant will not pose an unreasonable risk of danger to public safety, as defined in section 1170.18, if treated in the community. (§ 1001.36, subd. (b)(1)-(2).) If the treatment under pretrial diversion is deemed successful, the charges shall be dismissed and the defendant's criminal record expunged. (§ 1001.36, subds. (b)(1)(A)-(C), (c)(3), (e).)

The statute further provides: "At any stage of the proceedings, the court may require the defendant to make a prima facie showing that the defendant will meet the minimum requirements of eligibility for diversion and that the defendant and the offense are suitable for diversion. The hearing on the prima facie showing shall be informal and may proceed on offers of proof, reliable hearsay, and argument of counsel. If a prima facie showing is not made, the court may summarily deny the request for diversion or grant any other relief as may be deemed appropriate." (§ 1001.36, subd. (b)(3).)

In *Frahs*, our Supreme Court concluded *Estrada's* inference of retroactivity applies to section 1001.36 such that defendants with qualifying mental disorders whose cases are not yet final are entitled to limited remand for the trial court to determine whether they are eligible for mental health diversion. (*Frahs, supra*, 9 Cal.5th at pp. 624-625; see *Estrada, supra*, 63 Cal.2d 740.) The court concluded "the possibility of being granted mental health diversion rather than being tried and sentenced 'can result in dramatically different and more lenient treatment.' " (*Frahs*, at p. 631, quoting *Lara, supra*, 4 Cal.5th at p. 303.) Our Supreme Court relied on its decision in *Lara*, where it concluded the ameliorative benefits of Proposition 57, which prohibits prosecutors from charging juveniles with crimes directly in adult criminal court, are retroactively applicable to juveniles whose judgments are not yet final at the time Proposition 57 was enacted. (*Frahs*, at p. 629; *Lara,* at pp. 303-304.) The *Frahs* court concluded the

9

pertinent facts "are like those involved in *Lara*." (*Frahs*, at p. 631.) Specifically, the court reasoned "the impact of a trial court's decision to grant diversion can spell the difference between, on the one hand, a defendant receiving specialized mental health treatment, possibly avoiding criminal prosecution altogether, and even maintaining a clean record, and on the other, a defendant serving a lengthy prison sentence." (*Ibid*.) The court therefore concluded "the ameliorative nature of the diversion program places it squarely within the spirit of the *Estrada* rule," and thus the program retroactively applies to defendants whose cases are not yet final. (*Ibid.*) That is the case for defendant here.

The *Frahs* court further rejected the People's argument the defendant there was not entitled to remand because he did not make an adequate showing of eligibility. (*Frahs, supra*, 9 Cal.5th at pp. 637-638.) The People argued the defendant had to demonstrate he met all six threshold eligibility requirements before the appellate court could remand. (*Ibid*.) The court found imposing such a high bar for remand "would be unduly onerous and impractical" and "inconsistent with any sensible retroactive application of the statute." (*Id*. at p. 638.) Instead, the court concluded "a conditional limited remand for the trial court to conduct a mental health diversion eligibility hearing is warranted when, as here, the record affirmatively discloses that the defendant appears to meet at least the first threshold eligibility requirement for mental health diversion -- the defendant suffers from a qualifying mental disorder." (*Id*. at p. 640.)

Defendant points to evidence in the record indicating that he suffers from mental health disorders that qualify for diversion under section 1001.36, including bipolar disorder and posttraumatic stress disorder. (See § 1001.36, subd. (b)(1)(A).) In view of *Frahs*, we conclude defendant is entitled to a conditional remand to allow the trial court to conduct a mental health diversion eligibility hearing under section 1001.36. Given our conclusion, we need not and do not consider defendant's equal protection argument.

10

## DISPOSITION

We conditionally reverse the judgment and remand to the trial court for an eligibility determination under section 1001.36.  " 'If the trial court finds that [defendant] suffers from a mental disorder, does not pose an unreasonable risk of danger to public safety, and otherwise meets the six statutory criteria (as nearly as possible given the postconviction procedural posture of this case), then the court may grant diversion.  If [defendant] successfully completes diversion, then the court shall dismiss the charges.  However, if the court determines that [defendant] does not meet the criteria under section 1001.36, or if [defendant] does not successfully complete diversion, then his conviction[] and sentence shall be reinstated.' "  (*Frahs, supra*, 9 Cal.5th at p. 641.)

/s/_____
Butz, J.*

We concur:

/s/_____
Raye, P. J.

/s/_____
Hoch, J.

---

* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11