Filed 3/20/24  P. v. Hattley CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Lassen)

----

| | |
|---|---|
| THE PEOPLE, | C097926 |
| Plaintiff and Respondent, | (Super. Ct. No. 2022CR0088963) |
| v. | |
| KESHAUN DONZALE HATTLEY, | |
| Defendant and Appellant. | |

A jury found defendant Keshaun Donzale Hattley guilty of attempted voluntary manslaughter and assault with a deadly weapon.  Defendant contends on appeal that: (1) the trial court abused its discretion by admitting testimony identifying defendant in a surveillance video; (2) his trial counsel was ineffective for failing to object to statements made by the prosecutor during summation; and (3) cumulative error compels reversal. Finding no merit in defendant's contentions, we affirm.

## I.  BACKGROUND

In 2022, the People filed a consolidated information charging defendant with attempted murder (Pen. Code,[1] §§ 664, 187, subd. (a)) and assault with a deadly weapon

_____

[1]  Undesignated statutory references are to the Penal Code.

(§ 245, subd. (a)(1)).  As to both counts, the information alleged that defendant personally inflicted great bodily injury (§ 12022.7, subd. (a)) and as to the attempted murder charge, it further alleged that defendant used a deadly weapon, a baseball bat (§ 12022, subd. (b)(1)).

At trial, the People presented evidence about a fight that happened at a mobile home park on March 6, 2022.  At that time, the victim, Michael D., lived in the mobile home park with Aaron F. and Rebecca F.[2]  Aaron's daughter Chelsea F. lived in the same park at a different residence.

Chelsea testified that on March 5, defendant and two females went to the gas station market where she worked.  The two females screamed at Chelsea, accusing her of having their dog and saying they would forcefully enter her home while she was at work.  This was Chelsea's first time interacting with defendant, although she recognized him from having seen him around the mobile home park.

Late that night after she got off work, a man approached Chelsea while she was outside her home.  Chelsea did not recognize him at first but as he got closer, she realized it was defendant who had been "harassing" her that day at her store.  She started walking backward toward her home and tapped on her bedroom window to get her boyfriend Faylon O.'s attention.  Faylon came outside, asked the man if he was a "fucking Chomo" (a term meaning child molester), and then punched him.  The man ran off.  At trial, Faylon identified defendant as the man he punched, although a detective testified that Faylon told him he was "not sure" about the man's identity.  Faylon testified he did not remember saying this to the detective.

---

[2]  To protect their privacy, we refer to some of the victims, witnesses, and others by their full first names and last name initials and, subsequently, by their first names.  (Cal. Rules of Court, rule 8.90(b)(4), (10).)

After Chelsea testified about the incident outside her home, the People began asking Chelsea about a surveillance video depicting this encounter. Defense counsel objected to Chelsea identifying defendant in the surveillance video arguing, among other things, that this testimony would be an improper lay opinion and invade the province of the jury. The trial court overruled the objection. Portions of the surveillance video were played for the jury and Chelsea identified defendant as the person approaching her in the video.

After the incident outside her home, Chelsea called her father, Aaron. Aaron, Michael, and Faylon went to tell defendant to stay away from Chelsea's home. While walking, they encountered a group of people. According to Aaron, this group included defendant, the codefendant Terry Decutler, and Kymber Decutler, who is defendant's fiancé and Terry's sister.

Aaron testified that Terry had an automatic rifle that he fired at Aaron. Faylon then struck Terry with a knife and grabbed the rifle until Terry dropped it. Aaron testified that, at about this time, defendant ran into a mobile home, came out with a baseball bat, and struck Michael in the head with the bat. Aaron, Michael, and Faylon retreated to Chelsea's residence. Portions of Michael's face and head were "beaten in" and he was bleeding profusely. He was admitted to the hospital for surgery to remove parts of his skull from his brain and for reconstructive surgery. Michael testified that he experiences ongoing problems due to his injuries, including constant headaches, problems with his memory, and a speech impediment.

After the incident, the police provided Aaron a photographic lineup that included defendant. The parties stipulated that the officer who administered this lineup, if called to testify, would have testified that: "I showed [Aaron] each picture separately. [Aaron] picked out Photo Number 3, but believed it to be Number 4, (Hattley), but felt the person in Photo Number 4 was too heavy. [Aaron] ultimately said he was 100 percent sure it was Photo Number 3." Aaron acknowledged he was unable to correctly identify defendant

3

during the photo lineup. He explained that the photos were old and that in some of the photos the suspects' faces were obscured by their hair. Aaron denied that he told the officer at the time of the lineup that he was "100 percent sure" the person in photo number 3 was the person who struck Michael with a baseball bat. Aaron testified that, at the time of trial, he was "1000 percent sure" defendant was the assailant.

Faylon was unable to say for certain at trial who struck Michael with a bat because he "was already engaged with two or three other people" when it happened. Michael testified he did not have clear memories of that night, citing his brain injuries. The last thing he recalled was trying to step on the rifle on the ground.

The prosecution introduced evidence regarding defendant's Facebook account in the name of "Kingee Carter." Terry's Facebook profile had a March 8 post tagging the Kingee Carter profile containing a moving picture of someone swinging a baseball bat with a "ha-ha" emoji. Another March 8 post on Kingee Carter's profile contained the hashtag "got 'em."

Defendant called Kymber as a witness. She testified that she and defendant had a child together and that defendant was at the trailer park earlier but left before the fight broke out. Kymber admitted she lied to a police officer who was investigating the incident and that she had a 2016 conviction for providing false identification to a peace officer.

During her rebuttal closing argument, the prosecutor addressed Aaron's misidentification of defendant in the photo lineup. She told a story about how she once witnessed a robbery but was unable to identify the perpetrator in a lineup: "When I was 20, I worked at a bank and I got robbed and I, as I stand here before you today, I can close my eyes and I can see crystal clear the person who robbed me 22 years ago. The FBI came down. Can you pick him out of a lineup? I am 100 certain I can pick him out of a lineup, his face is etched into my brain, he's burned into my retinas. I wish. I could not pick him out of a lineup. Does that mean I didn't get robbed? No. I couldn't pick him

4

out.  I can see him today.  Wouldn't know him walking down the street.  Couldn't pick him out of a lineup.  It's normal.  This is a normal thing."

At the conclusion of her rebuttal, the prosecutor said to the jury:  "It's very important for the People in the State of California, in and for the County of Lassen, to get justice for [the victim], and so I'm asking you what is your brand of justice for [the victim]?"  The trial court used CALCRIM Nos. 104 and 200 to instruct the jury that the attorneys' arguments are not evidence and the jury must follow the law, rather than the attorneys' arguments, if the two conflicted.

The jury found defendant not guilty of attempted murder but guilty of the lesser included offense of attempted voluntary manslaughter (§§ 664, 192, subd. (a)).  The jury also found defendant guilty of assault with a deadly weapon and found the great bodily injury and deadly weapon allegations to be true.

The trial court sentenced defendant to the middle term of three years for attempted voluntary manslaughter, one year for the deadly weapon enhancement, and three years for the great bodily injury enhancement.  Defendant's sentence for assault with a deadly weapon was stayed under section 654.

Defendant timely appealed.

## II.  DISCUSSION

A.    *Admission of Video Surveillance Identification*

Defendant first argues that the trial court abused its discretion by admitting Chelsea's testimony identifying defendant in the surveillance video because this testimony was improper lay opinion.  We disagree.

Under Evidence Code section 800, a lay witness may offer opinion testimony if it is "[r]ationally based on the perception of the witness" and "[h]elpful to a clear understanding of his testimony."  We review a trial court's decision to admit evidence for abuse of discretion.  (*People v. Thompson* (2010) 49 Cal.4th 79, 128.)  Under this standard, a trial court's ruling will not be disturbed unless the court exercised its discretion

5

in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Foster* (2010) 50 Cal.4th 1301, 1328-1329.)

"Court of Appeal decisions have long upheld admission of testimony identifying defendants in surveillance footage or photographs." (*People v. Leon* (2015) 61 Cal.4th 569, 601.) In *Leon*, the trial court allowed a detective to identify the defendant in a surveillance tape. (*Id*. at p. 600.) A detective testified he was " 'very' " familiar with the defendant's appearance though he had only first seen the defendant when he was arrested and subsequently spent about two hours with him. (*Ibid*.) Our Supreme Court held that because the detective's "testimony was based on his relevant personal knowledge and aided the jury, the court did not abuse its discretion by admitting it." (*Id*. at p. 601.) The court explained that "[q]uestions about the extent of [the detective's] familiarity with [the] defendant's appearance went to the weight, not the admissibility, of his testimony" and that "because the surveillance video was played for the jury, jurors could make up their own minds about whether the person shown was [the] defendant." (*Ibid*.; see also *People v. Son* (2020) 56 Cal.App.5th 689, 696-697 [finding no abuse of discretion when trial court permitted detective to narrate what she perceived in surveillance video].)

Defendant attempts to distinguish *Leon*, arguing that Chelsea's testimony "was not helpful to the jury determination of what was shown in the video," in large part because "Chelsea was unfamiliar with appellant." However, there is evidence to the contrary. Chelsea testified that she recognized defendant from having seen him around the mobile home park where she lived. Moreover, she had seen him earlier that day during the confrontation with him at her workplace and later that evening during the confrontation depicted in the video. As *Leon* explained, questions about the extent of Chelsea's familiarity with defendant's appearance go to the weight of her testimony, not its admissibility. Further, as in *Leon*, the jury here was shown the surveillance video and could decide for itself whether defendant was the person depicted. The trial court did not

6

abuse its discretion in admitting Chelsea's identification of defendant in the surveillance video.

## B. *Ineffective Assistance of Counsel*

Defendant next argues that his trial counsel was prejudicially ineffective by failing to object to two portions of the prosecutor's rebuttal closing argument, specifically: (1) the prosecutor's story about her inability to identify a robber in a lineup; and (2) the prosecutor's question to the jury "what is your brand of justice for [the victim]?"

To establish a claim for ineffective assistance of counsel, defendant must show his counsel's performance was deficient and that he suffered prejudice as a result. (*People v. Mickel* (2016) 2 Cal.5th 181, 198; *Strickland v. Washington* (1984) 466 U.S. 668, 687-692.) We presume that "counsel's actions fall within the broad range of reasonableness, and [we] afford 'great deference to counsel's tactical decisions.' " (*Mickel*, at p. 198.)

As our Supreme Court has observed, "certain practical constraints make it more difficult to address ineffective assistance claims on direct appeal rather than in the context of a habeas corpus proceeding." (*People v. Mickel*, *supra*, 2 Cal.5th at p. 198.) This is because "[t]he record on appeal may not explain why counsel chose to act as he or she did. Under those circumstances, a reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable." (*Ibid.*) We will reverse only if there is affirmative evidence that counsel had no rational tactical purpose for an act or omission. (*Ibid.*) If the record on appeal sheds no light on why trial counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one or there could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) A defendant thus bears a difficult burden when asserting an ineffective assistance claim on direct appeal. (*Mickel*, at p. 198.)

Defendant submits that his counsel should have objected because the prosecutor's statements amounted to prosecutorial misconduct or improper vouching.[3]  "Under federal law, ' "Improper remarks by a prosecutor can ' "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." ' " '  [Citation.]  Under state law, ' "a prosecutor who uses deceptive or reprehensible methods to persuade either the court or the jury has committed misconduct, even if such action does not render the trial fundamentally unfair." ' "  (*People v. Huggins* (2006) 38 Cal.4th 175, 206.)  A prosecutor engages in improper vouching when the prosecutor attempts to bolster a witness by reference to facts outside the record.  Thus, "it is misconduct for prosecutors to vouch for the strength of their cases by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it.  [Citations.] . . . Nor may prosecutors offer their personal opinions when they are based solely on their experience or on other facts outside the record."  (*Id.* at pp. 206-207.)

To prevail on a claim of prosecutorial misconduct in closing arguments, the defendant " 'must show that "[i]n the context of the whole argument and the instructions" [citation], there was "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." ' "  (*People v. Dalton* (2019) 7 Cal.5th 166, 251-252.)  In assessing such a claim, a reviewing court does " ' "not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' "  (*People v. Ramirez* (2022) 13 Cal.5th 997, 1129.)

The prosecutor's statements here were less than ideal.  Her personal story about being unable to identify a robber in a lineup relied on facts outside the record, and her assurance that such a misidentification "is a normal thing" could be understood as

---

[3]  Defendant concedes that any substantive claim on these grounds has been forfeited on appeal by his trial counsel's failure to object.

implying that misidentifications frequently occur in other cases. (Cf. *People v. Medina* (1995) 11 Cal.4th 694, 758 ["[P]rosecutors should not purport to rely on their outside experience or personal beliefs based on facts not in evidence when they argue to the jury"].) In addition, asking the jury what their "brand of justice" is could be understood as invoking the jurors' personal notions of justice as distinct from any legal standard.

Nonetheless, we reject defendant's claim of ineffective assistance of counsel. The record offers no insight as to why trial counsel did not object to the prosecutor's statements during her closing rebuttal. For example, it is possible that trial counsel wanted to avoid drawing the jury's attention to the challenged comments. (See *People v. Ramirez* (2019) 40 Cal.App.5th 305, 311 [finding no deficient performance for failure to object to prosecutor's comments in closing argument because "the jury may have looked bored, and the stimulus of an objection may have awakened the jurors' interest in a counterproductive way"]; cf. *People v. Boyette* (2002) 29 Cal.4th 381, 424 ["Failure to object rarely constitutes constitutionally ineffective legal representation"].) As a result, defendant has not established that his counsel's performance was deficient.

Further, defendant was not prejudiced by the failure to object. For a claim of ineffective assistance of counsel, prejudice is established if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.)

Here, the trial court instructed the jury that the attorneys' remarks were not evidence and that if there was any conflict between the court's instructions and what the attorneys said, they were to follow the court's instructions. We presume the jury followed those instructions in reaching a verdict (*People v. Boyette*, *supra*, 29 Cal.4th at p. 436) and we do " ' "not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements' " (*People v. Ramirez*, *supra*, 13 Cal.5th at p. 1129).

9

The challenged comments were a small part of a lengthy closing argument that spanned 38 pages in the reporter's transcript. Even if the prosecutor had not shared her story about being unable to identify a robber in a lineup, the jury would likely have still found Aaron's in-court identification reliable and credited it. This is especially true given that Aaron told the detective administering the photo lineup that he "believed" defendant's photo, which actually was in the lineup, was that of the assailant. In addition, there was other compelling evidence of defendant's guilt, including (1) the March 8 Facebook post of a person swinging a bat with a "ha-ha" emoji in which defendant's profile was tagged, and (2) another March 8 post on defendant's profile containing the hashtag "got 'em."

We reject defendant's claim of ineffective assistance of counsel.

C.     *Cumulative Error*

Defendant contends that the accumulation of the errors he raises on appeal undermined his right to a fair trial. Having found no errors, this claim is necessarily without merit. (See *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.)

### III.  DISPOSITION

The judgment is affirmed.

_/s/_____
Wiseman, J.*

We concur:

_/s/_____
Earl, P. J.

_/s/_____
Krause, J.

_____

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.