Filed 8/6/24  P. v. Kroll CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B319888 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. SA103166 |
| v. | |
| DAVID FERN KROLL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joseph J. Burghardt, Judge.  Affirmed.

Maria Leftwich, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Julie A. Harris, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted David Fern Kroll of stalking a woman. On appeal, Kroll argues the trial court erred by limiting the scope of his expert's testimony concerning the effects of his mental illness and substance abuse on his mental state at the time of the crime. He also argues the trial court should have granted a mistrial after the jury heard unprompted testimony that he had been in prison. We find no prejudicial error and affirm.

## FACTS AND PROCEDURAL BACKGROUND

In November 2019, Talia Landman moved into an apartment with a balcony overlooking an alley. Shortly after moving in, Landman noticed Kroll was living in a tent in the alley. Kroll would sometimes play loud music, talk to himself, or start screaming at no one in particular. He also has a history of methamphetamine use.

Landman decided to document Kroll's behavior by videotaping him with her cell phone. One day in May 2020, Kroll noticed Landman videotaping him and became upset. Kroll threw rocks at Landman and her dog. He yelled, " 'Bitch, you think I won't climb up there and fuck you up.' "

A few months later—around August 2020—Landman called the police after Kroll got into an argument with one of her neighbors. Landman talked to the responding officers outside the apartment building. After the officers left, Kroll walked past Landman's balcony and said, " 'You'll get yours tonight, bitch.' " Landman was inside her apartment at the time.

About a week later—on August 19—Landman woke up in the early morning to a loud noise. She looked outside and saw Kroll climbing up onto her balcony. Kroll looked at Landman and screamed that he was going to kill her and her dog. Landman was terrified and called 911. Kroll ran to a dark corner in the

2

alley and continued to talk about killing Landman and her dog. Kroll left before the police arrived.

After the balcony incident, Landman bought pepper spray and a taser, and she started sleeping with a knife next to her bed. Landman rearranged her sleep schedule so she would be awake during the early morning hours.

Landman went for a run on the morning of August 24. Kroll rode past her on his bicycle and said, " 'You want to play, bitch, I'll fuckin' kill you.' " Landman reported the incident to the police, and an officer helped her obtain an emergency protective order. An officer handed the order to Kroll.

Three days later—on August 27—one of Landman's neighbors alerted her that Kroll was riding his bicycle in the alley near her balcony. Landman needed to take her dog on a walk, so she left the apartment through a different door than usual to try to avoid Kroll. However, Kroll was waiting outside the apartment and saw Landman immediately.

Kroll rode past Landman on his bicycle, and Landman started videotaping him with her phone. Kroll took out his phone and appeared to videotape Landman. Kroll started riding toward Landman again, and she got out her pepper spray. Kroll reached his hand behind his body, and Landman thought he was trying to get something out of his backpack. When Kroll was two feet from Landman, she sprayed him with pepper spray and yelled for him to stay away from her. Kroll backed off and said something like, " 'I'll fuckin' kill you, bitch.' "

Kroll ran to a nearby gas station and washed his face with the water used to clean windshields. He then grabbed a squeegee from the gas station and started running back toward Landman. Landman's neighbors and a parking enforcement officer stopped

3

Kroll and surrounded him. They prevented Kroll from fleeing while Landman called 911.

The police responded to the call and arrested Kroll. According to one of the responding officers, Landman was shaking and visibly upset. Kroll appeared to be angry, but he answered the officer's questions appropriately. One of the officers searched Kroll's backpack and found a copy of the protective order.

The People charged Kroll with stalking (Pen. Code, § 646.9, subd. (a))[1] and alleged he committed the crime while a temporary restraining order was in effect (*id*., subd. (b)). The People also charged Kroll with disobeying a court order (§ 166, subd. (a)(4)), and two counts of making criminal threats (§ 422, subd. (a)). The People alleged Kroll had a prior conviction for making criminal threats, which qualified as a strike for purposes of the Three Strikes law.

Landman was the People's primary witness at trial, and she testified to most of the facts summarized above. The People also presented testimony from Landman's neighbor, police officers, and the parking enforcement officer who came to Landman's aid. In his defense, Kroll presented expert testimony from Dr. Katy Drorit Gaines, who is a neuropsychologist. We discuss Dr. Gaines's testimony in more detail below.

The jury convicted Kroll of stalking and found him not guilty of the other charges. Kroll waived his right to a jury trial on the prior conviction allegation, and the court found it to be true. The court sentenced Kroll to six years in prison, consisting of the high term of three years doubled for the prior strike.

---

[1] Statutory reference are to the Penal Code.

4

Kroll timely appealed.

## DISCUSSION

### 1. *The trial court did not deny Kroll a full defense*

Kroll argues the trial court violated his right to present a full defense by restricting expert testimony concerning his mental conditions and their effect on his mental state at the time of the alleged crimes.

#### a. *Relevant law and standard of review*

Stalking, in violation of section 646.9, has three elements: (1) repeatedly following or willfully and maliciously harassing another person, and (2) making a credible threat (3) with the intent to place that person in reasonable fear for his or her safety. (§ 646.9, subd. (a).) It is a specific intent crime. (See *People v. Carron* (1995) 37 Cal.App.4th 1230, 1233.)

Sections 28 and 29 limit the admission of evidence concerning a defendant's mental illness to show or negate the mental state element of a crime. Section 28 states, in relevant part, evidence of a defendant's "mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state." (§ 28, subd. (a).) Instead, such evidence is admissible "solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought." (*Ibid.*) Section 29 states an expert may not testify "as to whether the defendant had or did not have the required mental states, which include[s] . . . intent."

"[S]ections 28 and 29 do not prevent the defendant from presenting expert testimony about any psychiatric or psychological diagnosis or mental condition he may have, or how that diagnosis or condition affected him at the time of the offense,

5

as long as the expert does not cross the line and state an opinion that the defendant did or did not have the intent, or malice aforethought, or any other legal mental state required for conviction of the specific intent crime with which he is charged." (*People v. Cortes* (2011) 192 Cal.App.4th 873, 908 (*Cortes*).)

We review the trial court's decision to exclude expert testimony for abuse of discretion. (*People v. Pearson* (2013) 56 Cal.4th 393, 443.)

b. *Background*

Before trial, the People moved to preclude Dr. Gaines from testifying, arguing her testimony would be irrelevant and would not negate any element of the charged crimes. The court was skeptical of the motion, noting mental illness evidence has the potential to "negate specific intent." The court also indicated Dr. Gaines's testimony would be admissible to the extent it concerned Kroll's mental illness at the time of the crimes and how it affected his specific intent.

After listening to Dr. Gaines's testimony at an Evidence Code section 402 hearing, the court denied the People's motion. However, the court ordered Dr. Gaines not to testify to Kroll's capacity to have the required intent or whether he actually had the required intent.

On direct examination during the defense case, Dr. Gaines testified that she interviewed Kroll over the course of six hours, evaluated him using standardized tests, reviewed his mental health records, and watched videos Landman had taken of him. Dr. Gaines diagnosed Kroll with schizophrenia paranoid type, major neurocognitive disorder multiple ideologies, and prenatal alcohol exposure.

Dr. Gaines explained that Kroll's conditions cause delusions, hallucinations, and disorganized speech. The conditions may cause a person to struggle to maintain relationships, react strongly to criticism, and perceive his environment as threatening, even if it is not. In addition, individuals who suffer from schizophrenia may use methamphetamine to self medicate.

According to Dr. Gaines, Kroll scored in the "impaired" range on an I.Q. test and scored extremely poorly on a test measuring planning and organizing information. His profile showed impairment in executive functioning, memory and learning, and impulse control. Those impairments are commonly found in persons suffering from schizophrenia and those with a history of long-term methamphetamine use. Kroll also displayed difficulty modulating his behavior, thoughts, and emotions.

Defense counsel asked Dr. Gaines to discuss how Kroll's diagnoses "address the issue of whether or not Mr. Kroll had an intent . . . that a threat be[ ] taken as a threat?" Dr. Gaines responded that it is "not possible for [her] to say what his intent is or was at a particular moment in time," nor was she able to know his mental state at the time he acted. She could only "opine on whether the conditions that [Kroll] has . . . can impair thought processes that have to do with the formation of intent."

Dr. Gaines went on to explain that Kroll has several serious mental health and neurocognitive disorders that affect the way his thoughts are formulated and processed. She noted that intent has to be formulated for a person to then elect to take an action. Given Kroll's conditions, it is possible there was an "interruption" to the process of the formulation of intent. Moreover, a person with impaired executive functioning may

have trouble inhibiting reactions and emotions. Therefore, such a person might "blurt" something out that they later regret.

Defense counsel asked Dr. Gaines to watch some of the videos Landman had taken of Kroll. Dr. Gaines remarked that Kroll's presentation in the videos was consistent with a person suffering from schizophrenia and under the influence of a substance. One video showed Kroll talking to himself, which Dr. Gaines said is a common behavior for people suffering from schizophrenia and paranoia. In another video, Kroll was riding a bicycle and videotaping Landman. Dr. Gaines was not surprised that Kroll was videotaping Landman, explaining it was a common reaction for people with paranoia.

Another video apparently showed Landman taunting Kroll. Dr. Gaines explained that this type of interaction could elicit a reaction from someone with Kroll's conditions. She noted that Kroll did not react to Landman's taunts in the video, which suggested his schizophrenia may have been less active at the time the video was taken. Dr. Gaines also suggested Kroll might become more volatile while under the influence of methamphetamine.

Defense counsel asked Dr. Gaines if she could form an opinion on Kroll's mental state based on evidence showing he was coherent while talking to a police officer after an encounter with Landman. Dr. Gaines said it would be "inappropriate" for an expert to formulate an opinion based on a single piece of data.

Defense counsel then asked, "So given Mr. Kroll's psychological setting in August of 2020, particularly August 19th through 27th of 2020, do you have an opinion as to whether the type of encounters Mr. Kroll had with Ms. Landman on those dates could have resulted in him making threats that he did not

8

intend as actual threats?" The prosecutor objected, and the court sustained the objection.

At defense counsel's request, the parties and the court discussed the objection at a sidebar. The court explained it sustained the objection because Dr. Gaines testified she could not opine as to Kroll's intent on a particular day, yet it seemed defense counsel was "getting into the specific day and his specific mental state."

Defense counsel disagreed, stating he asked about Kroll's "psychological setting," not his specific mental state. Counsel noted that he asked the expert whether Kroll *could* form the requisite intent, not whether he actually did so. The court responded that Dr. Gaines had already answered that question when she testified Kroll's mental illness and methamphetamine use could affect his decision-making, impulse behavior, and thought process. The court also noted Dr. Gaines "already told us that she's not familiar and not able to opine on what his mental state was that particular day."

Defense counsel suggested the court was conflating the issue of whether Kroll's conditions could affect his intent with the issue of whether he did, in fact, form the requisite intent. The court disagreed and clarified that defense counsel could ask the expert if, "based on her knowledge of his mental illness, her testing of him, that it could affect his ability to form the processes and intent." Defense counsel said he would "ask it that way."

After the sidebar, defense counsel asked Dr. Gaines one question, "[H]ow does the diagnosis that you talked about— how does that describe or impact [Kroll's] mental state?" Dr. Gaines responded, "These types of diagnos[e]s can impact the consciousness and the awareness and the clarity of the

9

thought process and therefore a person may do things or say things that they don't mean to."

    c.    *Application*

Kroll argues the trial court erroneously excluded Dr. Gaines's expert testimony concerning the effects of his mental conditions at the time of the alleged offenses. Specifically, he contends the court erred by precluding defense counsel from asking Dr. Gaines, "So given Mr. Kroll's psychological setting in August of 2020, particularly August 19th through 27th of 2020, do you have an opinion as to whether the type of encounters Mr. Kroll had with Ms. Landman on those dates could have resulted in him making threats that he did not intend as actual threats?" According to Kroll, the record shows the court sustained the objection based on the erroneous belief that experts are prohibited from testifying about the effects of a defendant's mental condition at the time of an offense.

Contrary to Kroll's contention, the trial court neither expressed, nor implied, it sustained the objection for that reason. The record instead makes clear the court understood the scope of sections 28 and 29, including that an expert may testify to the effects of a defendant's mental conditions at the time of an alleged crime. Indeed, while discussing the People's pretrial motion to preclude Dr. Gaines from testifying, the court explicitly stated her testimony would be admissible if she opined that he was suffering from a mental illness "on that day at that particular time." The court also noted evidence of a defendant's mental illness may "negate specific intent." It is apparent from these comments that the court understood Dr. Gaines could testify to Kroll's specific conditions at the time of the offenses and how those conditions may have affected his intent.

10

Kroll nevertheless suggests the court must have misunderstood the law because the wording of defense counsel's question was substantially similar to the language the court approved in *People v. Nunn* (1996) 50 Cal.App.4th 1357 (*Nunn*). In *Nunn*, a jury convicted the defendant of attempted murder after he fired gunshots at several people standing next to a road. (*Id.* at pp. 1359–1360.) On appeal, the defendant argued the trial court erred by excluding expert testimony that the defendant's " 'tendency to overreact, coupled with his level of inebriation, resulted in his impulsive firing of the weapon' " at the victims. (*Id.* at pp. 1359, 1362.) The court rejected the argument, explaining sections 28 and 29 precluded the expert from testifying "that [defendant] had acted impulsively, that is, without the intent to kill, that is, without express malice aforethought." (*Id.* at p. 1365.) In dicta, the court noted the expert could have testified to other issues, including whether the encounter with the victims "was the type that could result in an impulsive reaction from one with [defendant's] mental condition." (*Ibid.*)

Kroll's reliance on *Nunn* is misplaced. At the outset, the *Nunn* court did not approve specific language that defendants may use to question experts at trial. Instead, the language on which Kroll relies comes from dicta concerning potential topics the expert could have testified to in that particular case. Therefore, although *Nunn* may be relevant to whether the subject matter of Kroll's question was appropriate, the fact that defense counsel used similar language while questioning Dr. Gaines is not determinative.

In any event, Kroll's question differed from the *Nunn* dicta in a meaningful way. In *Nunn*, the court noted the expert could

have testified to whether the circumstances of the case might cause a *hypothetical person* with the defendant's mental condition to act with a certain mental state. (*Nunn, supra*, 50 Cal.App.4th at p. 1365.) Here, in contrast, defense counsel asked Dr. Gaines whether the circumstances of the case could have caused *Kroll, himself*, to act with a certain mental state.

By making Kroll the focus of the question—rather than a hypothetical person with the same mental condition—defense counsel's question came perilously close to asking Dr. Gaines to opine on whether Kroll actually possessed the requisite mental state for the crime. Therefore, even if counsel did not intend to ask for an opinion on Kroll's actual mental state, there was a significant risk Dr. Gaines or the jury would interpret it that way. The risk was compounded by the fact that defense counsel's question was relatively long, contained multiple clauses, and was somewhat difficult to follow. Under these circumstances, the court acted reasonably and appropriately by sustaining the objection to defense counsel's question.

Even if the court erred by sustaining the objection, the error was harmless under any standard. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [reversal is required unless the error was harmless beyond a reasonable doubt]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [reversal is required only if it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"].)

Contrary to Kroll's suggestions, the court did not categorically preclude him from presenting evidence explaining how his mental illness and drug use may have affected his mental state at the time of the offenses. Instead, the court

12

consistently stated Kroll could explore those topics with his expert.  Before trial, for example, the court stated Dr. Gaines's testimony would be admissible if it concerned the effects of his mental illness at the specific time he committed the alleged crimes.  The court also suggested Dr. Gaines could testify about how this affected Kroll's specific intent.  Moreover, even after sustaining the objection to defense counsel's question, the court allowed him to ask Dr. Gaines how Kroll's mental illness "could affect his ability to form the processes and intent."

Consistent with the court's statements, defense counsel asked Dr. Gaines to explain how Kroll's diagnoses "address the issue of whether or not Mr. Kroll had an intent . . . that a threat be[ ] taken as a threat."  In response, Dr. Gaines testified at length concerning how Kroll's mental conditions affect intent generally, and how they could have caused Kroll specifically to verbalize a threat he did not intend to make.  Dr. Gaines also reviewed videos showing Kroll interacting with Landman and discussed how Kroll's mental conditions may have affected his behavior during those interactions.  On this record, there is simply no merit to Kroll's contention that the court prevented him from presenting a full defense concerning the effects of his mental conditions at the time of the offenses.

Nor is there merit to Kroll's contention that the prosecutor "capitalized" on the court's ruling during her closing argument.  Kroll points to the prosecutor's comment that Dr. Gaines "can't say what [Kroll's] intent is or was at a particular time.  That is what you decide as the jury."  The prosecutor accurately quoted Dr. Gaines's testimony, and her comments were consistent with the law.  Section 29 plainly states an expert "shall not testify as to whether the defendant had or did not have the required

13

mental states." Instead, the "question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact." (*Ibid*.) Simply stated, there is nothing improper about the prosecutor's remarks.

*Cortes, supra*, 192 Cal.App.4th 873 and *People v. Herrera* (2016) 247 Cal.App.4th 467 are inapposite. The trial courts in those cases broadly prohibited expert testimony concerning the defendants' mental conditions at the time of the alleged crimes. The trial court in *Cortes*, for example, excluded testimony "about defendant's particular diagnoses and mental condition and their effect on him at the time of the offense." (*Cortes*, at p. 909.) The trial court in *Herrera* similarly excluded expert testimony concerning " 'anything related to' " the defendant's mental state at the time of the crime. (*Herrera*, at pp. 474–475.) Both rulings were prejudicial because they "robbed" the expert testimony of relevance and left the jury no basis to infer the defendant did not act with the requisite mental state. (*Cortes*, at p. 912; *Herrera*, at p. 478.)

The trial court did nothing comparable in this case. The court sustained an objection to a single question from defense counsel, but it did not categorically exclude evidence concerning Kroll's mental conditions at the time of the alleged offenses. Instead, the court repeatedly ruled Kroll could elicit expert testimony on the issue. Dr. Gaines, in turn, testified at length concerning how Kroll's mental conditions may have led him to make statements that resembled threats, but without having intended to threaten Landman.

Considering the entire record and all the circumstances, any error in sustaining an objection to defense counsel's question was harmless beyond a reasonable doubt. (See *People v. Nieves*

14

(2021) 11 Cal.5th 404, 441 [court's limit on expert testimony under section 29 was harmless error where the "defense experts were otherwise able to testify concerning the substance of what defendant sought to present"].) Accordingly, it does not provide grounds to reverse the judgment.

## 2. *The trial court properly denied Kroll's motion for a mistrial*

Kroll argues the trial court erred in denying his motion for a mistrial after the jury heard unprompted testimony that he had been in prison.

### a. *Background*

During Landman's direct testimony, the prosecutor asked if she had changed her daily routine because of her interactions with Kroll. Landman responded that she no longer slept through the night and had started intensive therapy. Landman continued: "I live—you know, just because he was in prison doesn't mean that every—." The court interrupted Landman, telling her to "[h]old on." The court then immediately instructed the jury, "That statement is not to be considered by the jurors. Jurors to disregard that statement."

Defense counsel requested a sidebar, at which he moved for a mistrial. Counsel argued the comment painted Kroll as the "kind of person that's fairly consistent with that conduct that he'd been in prison." The prosecutor opposed the motion, noting it seemed Landman was referring to the fact that Kroll had been in jail in connection with the charged crimes. Defense counsel disagreed, pointing out that Landman had referred specifically to prison. The court denied the motion, stating it would instead give another admonition.

15

After the sidebar, the court instructed the jury, "[T]he witness just made a comment. There's no evidence that the defendant either has been to prison or he's in prison. You're to completely and totally disregard that." The prosecutor then continued her direct examination.

b.     *Analysis*

We review the denial of a mistrial motion under the deferential abuse of discretion standard. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1068.) " 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' " (*Ibid.*)

Here, the trial court did not abuse its discretion in denying Kroll's motion for a mistrial. Contrary to Kroll's contentions, it is unlikely the jury understood Landman's comment to imply he had a prior conviction. Landman made the improper comment while discussing changes she made to her routine as a result of her encounters with Kroll. Given this context, it is reasonable to infer she was referring to the fact that Kroll had been incarcerated as a result of one of those interactions.

If the jury understood the comment in that way, Kroll suffered no prejudice. Kroll did not object when another witness testified that the police took him to jail following his most recent encounter with Landman. Kroll later played for the jury a video of that arrest, which showed him lying in the street while officers held him at gunpoint. That Kroll voluntarily introduced evidence of his arrest—and declined to object to evidence that the officers took him to jail—strongly suggests he suffered no prejudice from

16

Landman's brief reference to his incarceration.[2] (See *People v. Collins* (2010) 49 Cal.4th 175, 196–199 [where the defendant established his incarceration as part of his defense strategy, the trial court properly denied a motion for a mistrial after a witness mentioned the incarceration].)

Even if the jury understood the comment to refer to a prior conviction, the trial court's quick and decisive actions were more than sufficient to cure any potential prejudice. The trial court interrupted Landman's testimony—even before defense counsel had a chance to object—and immediately instructed jurors not to consider her statement that Kroll had been in prison. After a brief discussion with counsel, the court again instructed the jurors to "completely and totally disregard" Landman's comment, and told them there was "no evidence" that Kroll had been in prison. That the jury acquitted Kroll on the majority of the charges strongly suggests Landman's comment was not so outrageous or inherently prejudicial that an admonition could not have cured it. Accordingly, we may presume the jury followed the court's instruction to disregard the testimony, which was sufficient to cure any potential prejudice. (See *People v. Avila* (2006) 38 Cal.4th 491, 574 [trial court's admonition cured prejudice from testimony that the defendant recently had been in prison]; *People v. Valdez* (2004) 32 Cal.4th 73, 123 [a witness's "fleeting reference to 'jail' was not 'so outrageous or inherently prejudicial that an admonition could not have cured it' "]; *People v. Navarrete* (2010) 181 Cal.App.4th 828, 834 ["Ordinarily, a

---

[2]    We acknowledge the officers took Kroll to jail, whereas Landman said he had been in prison. Nevertheless, we think it is unlikely the jurors would have recognized that distinction or inferred anything from it.

curative instruction to disregard improper testimony is sufficient to protect a defendant from the injury of [improper] testimony, and, ordinarily, we presume a jury is capable of following such an instruction."].)

Kroll's reliance on *People v. Ozuna* (1963) 213 Cal.App.2d 338, and *People v. Allen* (1978) 77 Cal.App.3d 924 (*Allen*), is misplaced. In *Ozuna,* the prosecutor purposely elicited testimony that the defendant was an "ex-convict." (See *Ozuna*, at p. 341.) On appeal, the court concluded a curative admonition was not sufficient to remove any prejudice, explaining the "objectionable testimony was produced in order to strengthen the People's case by generating prejudice in the minds of the jurors. . . . [I]ts use for that purpose was not only serious misconduct but was fraught with such harm to defendant as to be irremediable." (*Id*. at p. 342.)

In *Allen, supra*, 77 Cal.App.3d 924, a witness improperly testified that the defendant had been on parole. (*Id*. at p. 929.) The reviewing court concluded an admonition was not sufficient to cure the testimony's prejudice because it was an extremely close case that turned on the defendant's credibility. (*Id*. at pp. 934–935.) Under those circumstances, the court explained, knowledge that the defendant had a prior conviction may have been enough to convince the jury to convict him. (*Id*. at p. 935.)

The circumstances of this case are not comparable to *Ozuna* or *Allen*. Unlike *Ozuna*, there is nothing even to suggest Landman or the prosecutor acted in bad faith. (See *Allen, supra*, 77 Cal.App.3d at p. 934 [suggesting the presumption the jury followed an admonition to disregard improper testimony may not apply where there is bad faith].) Moreover, unlike *Allen*, this case did not turn on Kroll's credibility. Instead, it turned

on whether the jury believed Kroll's mental illness and drug use caused him to act without the requisite intent. That Kroll had been incarcerated—either in connection with the charged crimes or a prior conviction—had little, if any, relevance to that issue.

**3.    *We reject Kroll's cumulative error contention***

Kroll argues the cumulative effect of the trial court's errors deprived him of a fair trial and requires reversal of his conviction. "In examining a claim of cumulative error, the critical question is whether defendant received due process and a fair trial." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.) Here, we are satisfied that Kroll received a trial that was fair and comported with due process.

## DISPOSITION

We affirm the judgment.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



EGERTON, J.


We concur:



EDMON, P. J.



ADAMS, J.